472 S.E.2d 792

STATE of West Virginia, By and Through Darrell V. McGRAW, Jr., Attorney General, Plaintiff Below, Appellee,

v.

IMPERIAL MARKETING, et al., Defendants Below,

Suarez Corporation Industries, Defendant Below, Appellant.

No. 22809.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 20, 1995.

Decided March 20, 1996.

Steven Zaleznick, Deborah Zuckerman, Washington, DC, for amicus curiae American Association of Retired Persons.

RECHT, Justice:

The defendant below and appellant herein, Suarez Corporation Industries (hereinafter "SCI"), appeals an order of the Circuit Court of Kanawha County granting a preliminary injunction restricting the method and manner by which SCI may solicit consumers in West Virginia in the sale of jewelry and other products either manufactured or distributed by SCI. In reaching its decision, the circuit court found that there was reasonable cause to believe that SCI was engaging in or is likely to engage in conduct in violation of specific provisions of the West Virginia "Prizes and Gifts Act," W.Va.Code 46A–6D–1 to –10 (1992), and accordingly granted the preliminary relief requested prohibiting specified conduct found to be in violation of the Act. We affirm this ruling, with a modification limiting the duration of the temporary injunction.

## I.

### PROCEDURAL HISTORY

The genesis of this injunction proceeding was a complaint filed by the Attorney General of West Virginia alleging violations of unlawful acts and practices under the West Virginia Consumer Credit and Protection Act, W.Va.Code 46A–6–104 (1974), and the West Virginia Prizes and Gifts Act, W.Va. Code 46A–6D–1 to –10 (1992), which is fully contained within the Consumer Credit and Protection Act, against four companies whose common business practice included the sale of consumer products through direct mail solicitations. SCI was not one of those named in the original civil action. Following additional investigation, however, the number of defendants in the original civil action was expanded to include SCI.[1]

Tom Rodd, Senior Assistant Attorney General, Morgantown, and Silas Taylor, Office of the Attorney General, Charleston, Victor S. Woods, Assistant Attorney General, Charleston, for Appellee.

James M. Cagle, Charleston, and Carter G. Phillips, Jeffrey T. Green, David D. Meyer, Sidley & Austin, Washington, DC, for Appellant Suarez.

James Zimarowski, Morgantown, for amicus curiae Council of Senior West Virginians.

---

1. The amended pleading included an additional 102 defendants, including SCI. For reasons not appearing in the record, the Attorney General chose to proceed exclusively against SCI, asserting that the methods used by SCI were a model for all of the defendants. We make no comment relating to any aspect of whether this matter is appropriate for a defendant's class action under W.Va.R.Civ.P. 23(a). *See generally* 1 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions* § 4.45 (3rd ed. 1992).

SCI is an Ohio corporation[2] engaged in the business of selling consumer goods, such as simulated jewelry, by use of direct mailing. This direct mailing often takes the form of a "sweepstakes promotion," a device that informs potential consumers that they are eligible or "tied" to win a prize, often in the form of cash up to $10,000, or an automobile. This marketing scheme is designed to ultimately sell a product through the consumer's expectation of winning a valuable prize.

The factual underpinnings alleged by the Attorney General to support the request for injunctive relief concerned the deceptive and misleading methods utilized by SCI to sell various products. The central theme of the alleged deceptive and misleading practices used by SCI was to sell a product by convincing West Virginia consumers that they had won a prize or gift when, in reality, the award of the prize or gift was an illusion and nothing more than an elaborate ruse to sell SCI's product. This method of selling a product was alleged to have violated various provisions of the West Virginia Prizes and Gifts Act (hereinafter the "Act"), including: misrepresentation of having won a prize in violation of W.Va.Code 46A-6D-3 (1992); misrepresentation of eligibility to win or receive a prize in violation of W.Va.Code 46A-6D-4 (1992); misrepresentation of being a specially selected person in connection with the sale of a product in violation of W.Va. Code 46A-6D-5 (1992); and the improper use of simulated checks in connection with a sale of a product in violation of W.Va.Code 46A-6D-6 (1992).

The legal foundation for the temporary injunction was the exercise of the Attorney General's power to enforce the provisions of the Consumer Credit and Protection Act and, specifically, the power to temporarily enjoin any violation of the Act or any fraudulent or unconscionable conduct as contemplated within the West Virginia Consumer Credit and Protection Act, all as recited in W.Va. Code 46A-7-110 (1974).[3]

The Circuit Court of Kanawha County conducted two separate hearings relating to the requests for temporary relief. The first hearing resulted in the granting of a temporary injunction on September 9, 1994. The second hearing resulted in a modification of that initial order, emerging from a motion filed by SCI to dissolve the initial injunction. It is this order, entered on November 3, 1994, which granted temporary injunctive relief, from which SCI appeals.[4]

---

**2.** Suarez Corporation Industries does business using a number of different names including: Lindenwold Fine Jewelers; Earnest and Alexander Holding Associates; Case Waterman and Associates (with headquarters in the Edgar Price Professional Building); and DeVoorst (international purveyors of fine diamonds and gemstones).

**3.** W.Va.Code 46A-7-110 (1974) provides as follows:

> With respect to an action brought to enjoin violations of this chapter or unconscionable agreements or fraudulent or unconscionable conduct, the attorney general may apply to the court for appropriate temporary relief against a respondent, pending final determination of the proceedings. If the court finds after a hearing held upon notice to the respondent that there is reasonable cause to believe that the respondent is engaging in or is likely to engage in conduct sought to be restrained, it may grant any temporary relief or restraining order it deems appropriate.

**4.** The core provisions of the temporary injunction prevent SCI from engaging in any consumer solicitation utilizing the following practices:

1. Soliciting consumers in West Virginia with an offer which denominates an item as a prize, gift, award, premium, or similar term that implies the item is free whether stated or represented in any way, when the intended recipient is required to spend any sum of money to make meaningful use of it;
2. Representing to consumers in West Virginia that the prize, gift, award, premium or similarly denominated item or any good or service offered to consumers has a value in excess of the fair market value at which substantial sales of the item are made in the area where the item is being offered;
3. Representing to consumers that they have specific odds or chances of winning a prize, contest, sweepstakes, or similar promotion, unless the specific odds or chance of winning has been numerically determined and can be substantiated prior to transmittal of the solicitation;
4. Sending to potential customers in West Virginia solicitations which use language such as "you have won," "declaration of a cash prize," "you are entitled ...," "certified winner," and making representations to solicited persons in West Virginia of having won a prize, gift or other item of

SCI mounts a global challenge to the temporary injunction in terms of every finding of fact, conclusion of law, and ultimately the order granting temporary relief, upon a variety of grounds including:

(1) No phase of SCI's sales scheme violates the Act;

(2) The method by which SCI sells its products in West Virginia is not "unconscionable conduct" within the meaning of W.Va. Code 46A–7–110 (1974);[5]

(3) The method and manner by which SCI communicates with potential West Virginia consumers is protected "commercial speech" under the First Amendment to the United States Constitution and Article III, Section 7 of the West Virginia Constitution, and therefore cannot be prohibited;

(4) The Act, as applied, violates the Commerce Clause of the United States Constitution (Article I, Section 8) by application of the doctrine of the "dormant" or "negative" Commerce Clause which, by negative implication, limits a State's right to interfere with interstate commerce.

In order to better understand SCI's challenge to the temporary injunction, we need to scrutinize with some particularity the various methods used by SCI to sell its products in West Virginia. The Suarez sales scheme is an ingenious blueprint to persuade a potential consumer to purchase an article of jewelry or personal accessory of questionable value by creating the elaborate illusion that by purchasing the product the consumer not only acquires a valuable possession, but also joins a select group of people eligible to win a great deal of money.

## II.

### STANDARD OF REVIEW

As is our custom, we begin any appellate analysis by first establishing the appropriate standard of review. In reviewing the exceptions to the findings of fact and conclusions of law supporting the granting of a temporary or preliminary injunction, we will apply a three-pronged deferential standard of review. We review the final order granting the temporary injunction and the ultimate disposition under an abuse of discretion standard, *West v. National Mines Corp.*, 168 W.Va. 578, 590, 285 S.E.2d 670, 678 (1981), we review the circuit court's underlying factual findings under a clearly erroneous standard,[6] and we review questions of law de novo. Syllabus Point 4, *Burgess v. Porterfield*, 196 W.Va. 178, 469 S.E.2d 114 (1996).

There is another more pointed justification for our deferential standard of review of the circuit court's granting of temporary relief within the provisions of W.Va.Code 46A–7–

---

value, unless the solicited person is in fact given the prize, gift or item of value, without obligation, and unless there is conformity with the conditions contained in W.Va.Code 46A–6D–3 (1992);

5. Sending solicitations to persons in West Virginia which use official sounding language and seals such as: judge's seal, office of the treasurer, claim processing division, that may lead a reasonable person to believe they have won anything of value, or sending solicitations that represent that the recipient has been specially selected when in fact that solicitation is part of a mass mailing;

6. Sending materials to persons in West Virginia which include writings that simulate a check or resemble a check or invoice in violation of W.Va.Code 46A–6D–6 (1992);

7. Sending solicitations to persons in West Virginia containing material referencing fake jewelry ratings or prize appraisals, bogus jewelers or agents who are holding prizes for the benefit of solicited customers in West Virginia;

8. Conducting any business in the State of West Virginia in violation of W.Va.Code 46A–6D–3 (1992), the Prizes and Gifts Act.

**5.** *See supra* note 3, for the text of W.Va.Code 46A–7–110 (1974).

**6.** We have recently defined "clearly erroneous" as follows:

A finding is "clearly erroneous" when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety.

Syllabus Point 1, in part, *In the Interest of: Tiffany Marie S.*, 196 W.Va. 223, 470 S.E.2d 177 (1996).

110 (1974). When applying W.Va.Code 46A–7–110 (1974), the circuit court is not required to adjudicate the merits as to whether there has been a violation of the Act pending a final determination of the proceedings.[7] To the contrary, the court's role at this stage is to moderate the effects of a likely violation of the Act as detected by the Attorney General and supported by sufficient proof that reasonable cause exists to believe that the respondent is engaging in or is likely to engage in conduct sought to be restrained.

■ Consequently, the judicial function is to supply a stopgap measure pending a final hearing when more permanent relief is sought. Therefore, our analysis of granting temporary relief under W.Va.Code 46A–7–110 (1974) is more narrow than the typical motion for a preliminary injunction.[8]

■ The method of analysis which governs the propriety and scope of an injunction under W.Va.Code 46A–7–110 (1974) deviates from the customary standard for the issuance of temporary relief and may best be described as whether the Attorney General has shown by the existence of some credible evidence, even if disputed, that reasonable cause exists to believe that the respondent is engaging in or is likely to engage in conduct sought to be restrained. In other words, the Attorney General need not prove the respondent has in fact violated the Act, but only needs to make a minimal evidentiary showing of good reason to believe that the essential elements of a violation of the Act are in view.

## III.

## APPLYING THE STANDARDS OF REVIEW

Applying these standards of review, we conclude that the Attorney General has satisfied the burden of offering both credible anecdotal and documentary evidence sufficient to support good reasons to believe that the essential elements of a violation of the Act are in view to the extent that reasonable cause exists to believe that SCI is engaging in, or is likely to engage in conduct which is sought to be restrained.

We begin our analysis by describing the means by which SCI sells their wares.

## THE SALE OF A CUBIC ZIRCONIUM STONE

■ Typical of the type of product sold by SCI is a CZ diamond, encased in a ring, pendant, or earrings mounting. The plan used to sell this product is to notify potential consumers that they have won a prize, identified as an *unmounted* 1–carat Lindenwold CZ diamond simulant,[9] and that they are eligible to win a larger prize of $10,000.

The artifice of teasing potential consumers with the free gift is that the CZ diamond is basically worthless unless the stone is mounted for $19. This is how it works:

In order to persuade consumers not to accept just the *unmounted* CZ diamond, the text of the solicitation is directed toward telling consumers that the opportunity for

---

7. The Attorney General is seeking additional relief beyond preliminarily enjoining SCI from engaging in violations of the Consumer Credit and Protection Act and the Prizes and Gifts Act, including: (1) a permanent injunction; (2) a disgorgement of funds illegally obtained to pay restitution to victimized West Virginians; (3) civil penalties in the amount of $5,000 for each violation of the West Virginia Consumer Credit and Protection Act; (4) costs and attorney fees; and (5) compensatory and punitive damages to be awarded after an appropriate class has been certified.

8. The customary standard applied in West Virginia for issuing a preliminary injunction is that a party seeking the temporary relief must demonstrate by a clear showing of a reasonable likelihood of the presence of irreparable harm; the absence of any other appropriate remedy at law;

and the necessity of a balancing of hardship test including: "(1) the likelihood of irreparable harm to the plaintiff without the injunction; (2) the likelihood of harm to the defendant with an injunction; (3) the plaintiff's likelihood of success on the merits; and (4) the public interest." *Jefferson County Bd. of Educ. v. Jefferson County Educ. Ass'n*, 183 W.Va. 15, 24, 393 S.E.2d 653, 662 (1990) (quoting *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bradley*, 756 F.2d 1048, 1054 (4th Cir.1985); *Blackwelder Furniture Co. v. Seilig Mfg. Co.*, 550 F.2d 189 (4th Cir.1977).

9. A 1–carat CZ diamond is a nonprecious stone made of cubic zirconium that, according to SCI, has a value of "up to" $80. SCI includes with many of its solicitations an appraisal and certificate of authenticity on its cubic zirconium stones.

winning the $10,000 is enhanced by purchasing the mounting.[10] The device used to carry out this inducement is to place a variety of obstacles in the path of claiming just the *unmounted* stone. In the event that consumers jump through the hoops of claiming simply the prize of an *unmounted* stone,[11] they are then sent a follow-up solicitation designed to persuade them to return the *unmounted* stone and purchase a mounting, the text of which informs them that if they do not purchase the mounting, their file will be closed, thereby creating the impression that unless consumers purchase the mounting, they will lose the opportunity of being awarded the $10,000 grand prize.

This method of selling a mounted cubic zirconium stone for $19 establishes reasonable cause to believe that SCI is engaging in or likely to engage in conduct which may violate the following provisions of the Prizes and Gifts Act:

(1) that part of the Act which proscribes obligating a consumer in order to receive the gift or prize [12] (W.Va.Code 46A–6D–3(a)(1) (1992)); [13]

(2) that part of the Act which requires delivery of a gift at no expense to the recipient and within ten days of the representation [14] (W.Va.Code 46A–6D–3(a)(2) (1992)); [15]

(3) that part of the Act which requires the disclosure of the true retail value of the prize [16] (W.Va.Code 46A–6D–4(a)(1)(i), (a)(2)(i) (1992)); [17]

10. SCI informs consumers that the stone has already been mounted, and according to the rules of the contest, SCI can award only the stone, not the mounting.

11. In order to claim the prize of the *unmounted* cubic zirconium stone, consumers must affix a label from one form on to another form, then handwrite a "code number" on the new form, then fill out a release form, and then mail it in a # 10 white envelope, which must be provided by the consumers. The failure to properly comply with this series of demands results in disqualification, both in terms of the *unmounted* stone and eligibility of the $10,000 grand prize. This cumbersome process is contrasted with the simplified method of purchasing the mounted stone, which only requires consumers to complete a simple order form and return it to SCI in a self-addressed envelope. Once a consumer completes the simplified order form to purchase the mounted stone and returns the form within the prescribed time period, there is no risk of being disqualified from winning the grand prize.

12. The evidence introduced at the preliminary stages of this case supports the finding that consumers are obligated to spend $19 in order to make meaningful use of the gift.

13. W.Va.Code 46A–6D–3(a)(1) (1992) provides:
(a) Unless otherwise provided by article six of this chapter, a person may not, in connection with the sale or lease or solicitation for the sale or lease of goods, property or service, represent that another person has won anything of value or is the winner of a contest, unless all of the following conditions are met:
(1) The recipient of the prize, gift or item of value is given the prize, gift or item of value without obligation....

14. The consumers are warned that since the stone is already mounted, it will take a longer period of time—up to sixty days—to receive the gift of an *unmounted* stone.

15. W.Va.Code 46A–6D–3(a)(2) (1992) provides:
(a) Unless otherwise provided by article six [§ 46A–6–101 et seq.] of this chapter, a person may not, in connection with the sale or lease or solicitation for the sale or lease of goods, property or service, represent that another person has won anything of value or is the winner of a contest, unless all of the following conditions are met:
\* \* \* \* \* \*
(2) The prize, gift or item of value is delivered to the recipient at no expense to him or her, within ten days of the representation.

16. The retail value of the prize being "up to" $80 does not represent a clear and meaningful disclosure. The ambiguity as to the value of the prize is compounded when SCI uses appraisals and jeweler's reports similar to those used for real diamonds, when the prize is nothing more than an ersatz diamond.

17. W.Va.Code 46A–6D–4(a)(1)(i), (a)(2)(i) (1992) provides:
(a) A person may not represent that another person is eligible or has a chance to win or to receive a prize, gift or item of value without clearly and conspicuously disclosing on whose behalf the contest or promotion is conducted, as well as all material conditions which a participant must satisfy. In an oral solicitation all material conditions shall be disclosed prior to requesting the consumer to enter into the sale or lease. Additionally, in any written material covered by this section, each of the following shall be clearly and prominently disclosed:
(1) Immediately adjacent to the first identification of the prize, gift or item of value to which it relates; or

(4) that part of the Act which requires the disclosure of the odds of winning the prize [18] (W.Va.Code 46A–6D–4(a)(1)(ii)–(iii), (a)(2)(ii)–(iii), (b)(2) (1992)); [19] and

(5) that part of the Act which proscribes using language that would lead reasonable persons to believe that they had been specially selected when that particular solicitation is part of a mass mailing [20] (W.Va.Code 46A–6D–5 (1992)). [21]

## THE SALE OF A CLUTCH PURSE ENSEMBLE

■ In this solicitation, SCI is selling a five-piece clutch purse ensemble. The inducement used to sell this product is to notify potential consumers that they have won a cash prize of "as much as" $1,000.

The consumers are told that their cash prize has been placed in one of the five clutch purses, all of which may be purchased for a price of $12 plus $2 for shipping and handling.

While the consumers are told that they need not purchase the clutch purse ensemble to claim their cash prize, SCI presents its solicitation in such a manner as to give consumers the impression that they will be given special preference if they purchase the purse ensemble. [22] As in the sale of the mounted cubic zirconium stone, SCI places numerous obstacles in the path of those consumers who wish to claim their prize without purchasing

---

(2) In a separate section entitled "Consumer Disclosure" which title shall be printed in no less than ten-point bold-face type and which section shall contain only a description of the prize, gift or item of value and the disclosures outlined in paragraphs (i), (ii) and (iii) of this subdivision:
    (i) The true retail value of each item or prize....
(emphasis added) (Note: Because of the structure of the statute, subparts i, ii and iii listed under subpart (2) also apply to subpart (1).).

18. The text of the solicitations contained inconsistent information as to the odds or chances of winning. Some state that "[t]he chances of winning any prize depend upon the number of entries actually received," others are silent as to the odds of winning; both of which fail to make a clear and meaningful disclosure of the odds of winning a prize as required by the Act.

19. W.Va.Code 46A–6D–4(a)(1)(ii)–(iii), (a)(2)(ii)–(iii), (b)(2) (1992) provides:
    (a) A person may not represent that another person is eligible or has a chance to win or to receive a prize, gift or item of value without clearly and conspicuously disclosing on whose behalf the contest or promotion is conducted, as well as all material conditions which a participant must satisfy. In an oral solicitation all material conditions shall be disclosed prior to requesting the consumer to enter into the sale or lease. Additionally, in any written material covered by this section, each of the following shall be clearly and prominently disclosed:
    (1) Immediately adjacent to the first identification of the prize, gift or item of value to which it relates; or
    (2) In a separate section entitled "Consumer Disclosure" which title shall be printed in no less than ten-point bold-face type and which section shall contain only a description of the prize, gift or item of value and the disclosures outlined in paragraphs (i), (ii) and (iii) of this subdivision:
    * * * * * *
    (ii) The actual number of each item, gift or prize to be awarded; and
    (iii) The odds of receiving each item, gift or prize.
    (b) All disclosures required by this article to be in writing shall comply with the following:
    * * * * * *
    (2) The number of each item, gift or prize to be awarded and the odds of receiving each item, gift or prize shall be stated in arabic numerals and shall be written in a manner which is clear and understandable.

20. In some of the solicitations, SCI informs consumers that they have qualified among *only 9%* of the entire population of the United States.

21. W.Va.Code 46A–6D–5 (1992) provides:
    (a) A person may not represent that another person has been specially selected in connection with the sale or lease or solicitation for sale or lease of goods, property or service, unless the selection process is designed to reach a particular type or types of persons.
    (b) The use of any language that may lead a reasonable person to believe he has been specially selected, including, but not limited to, "Carefully Selected", or "You have been selected to receive", or "You have been chosen", is a representation of the type governed by this section.

22. Consumers are informed that because SCI will have to remove the check from the purses of those not ordering, those who purchase the purse ensemble will receive priority handling.

SCI's product,[23] and requires consumers to respond within ten days or forfeit their prize.

This method of selling a five-piece clutch purse ensemble for $12 plus $2 shipping and handling establishes reasonable cause to believe that SCI is engaging in or likely to engage in conduct which may violate the following provisions of the Prizes and Gifts Act:

(1) that part of the Act which requires delivery of a gift at no expense to the recipient and within ten days of the representation [24] (W.Va.Code 46A–6D–3(a)(2) (1992)); [25]

(2) that part of the Act which requires the disclosure of the true retail value of the prize [26] (W.Va.Code 46A–6D–4(a)(1)(i), (a)(2)(i) (1992)).[27]

## THE SALE OF CANDLESTICK HOLDERS

■ It is SCI's goal in this solicitation to sell a product described as a pair of 24% heavy lead crystal candlestick holders. The purchase price of this product is $19. As an inducement to purchase the candlestick holders, SCI offers consumers a bonus of a glass heart-shaped dish at no additional cost. The candlestick holder purchasers are also eligible to win a $1,000 cash prize. The consumers are told that they do not need to purchase the candlestick holders to remain eligible for the $1,000 prize.

Superficially, it would appear that this method of selling a product is rather benign and an acceptable business practice. However well intended SCI may have acted in this method of selling a product, this marketing technique would also likely fail under the Act's scrutiny.

In order to entice consumers into purchasing the candlestick holders, SCI presents the text of the solicitation in such a way that would lead consumers to believe that their opportunity for winning the $1,000 cash prize improves if they purchase the candlestick holders. As with the mounted cubic zirconium stone and clutch purse schemes, SCI places numerous obstacles in the path of those who do not want to order the candlestick holders but wish to remain eligible for the $1,000 cash prize,[28] and consumers are told that those who do order will receive priority handling and immediate security processing. As further enticement, SCI offers consumers a simulated check that can only be used to cover the price of shipping and handling of the bonus glass heart-shaped dish, which can only be acquired by purchasing the candlestick holders.

This method of selling candlestick holders for $19 establishes reasonable cause to be-

---

**23.** To claim their cash prize without purchasing the clutch purse ensemble, consumers must cut out the prize confirmation bar code from the order form and paste it onto a 3½″ × 5½″ index card, which the consumer must furnish; then write their name, address, and phone number on the card; and then mail it in a #10 white envelope, which also must be provided by the consumers. The failure to properly comply with this series of demands results in a forfeiture of the cash prize. This cumbersome process is contrasted with the simplified method of purchasing the purse ensemble, which only requires consumers to complete a simple order form and return it to SCI in a self-addressed envelope. Once a consumer completes the simplified order form to purchase the purses and returns the form within the prescribed time period, there is no risk of being disqualified from winning the cash prize.

**24.** SCI informs consumers that they should allow forty-seven days from the time they receive the solicitation to the time they receive their cash prize. This time lapse of forty-seven days is a violation of W.Va.Code 46A–6D–3(a)(2) (1992), which requires that a prize be delivered within

ten days of the representation that a consumer has won a prize.

**25.** *See supra* note 15, for the text of W.Va.Code 46A–6D–3(a)(2) (1992).

**26.** Merely representing that one has won up to $1,000 is not a clear and meaningful disclosure as to the true amount of the prize won, and can mean as little as $1. Indeed, over 99.5% of the prizewinners win a $1 prize.

**27.** *See supra* note 17, for the text of W.Va.Code 46A–6D–4(a)(1)(i), (a)(2)(i) (1992).

**28.** If consumers do not wish to order the candlestick holders, they must print their name, address, and customer number onto a 3½″ × 5½″ index card and enclose it, along with the envelope provided for those who choose to purchase (presumably, envelopes with a certain code and of a certain color indicate those who have won), in a second envelope, which the consumers must provide. Consumers are given ten days from the date of receipt to respond.

lieve that SCI is engaged in or likely to engage in conduct which may violate the following provisions of the Prizes and Gifts Act:

(1) that part of the Act which requires the true retail value of the prize or gift [29] (W.Va. Code 46A–6D–4(a)(1)(i), (a)(2)(i) (1992)); [30] and

(2) that part of the Act which proscribes the use of a simulated check without conspicuously disclosing its true value and purpose [31] (W.Va.Code 46A–6D–6(a) (1992)).[32]

While the product and technique used in each of the various solicitations may vary, there is a commonality that pervades every one of SCI's marketing schemes: SCI induces consumers to purchase its products through misleading statements, thereby creating in the minds of the consumers a false expectation that if they purchase the product, they will enhance their chances of winning a prize of significantly greater value than the product being sold, and if they do not purchase the product and merely accept the worthless gift, their chances of winning the substantial prize are greatly reduced. SCI's sweepstakes are nothing more than ingeniously crafted deceptive methods to sell its merchandise by deluding consumers with expectations of greater rewards if they purchase the product that is the subject of the solicitation.[33]

---

**29.** No retail value is given for the bonus of the glass heart-shaped dish. SCI simply states it is "sure that the [matching heart-shaped dish] must be worth over $15." This disclosure does not provide consumers a clear and meaningful representation as to the true retail value of the bonus.

**30.** *See supra* note 17, for the text of W.Va.Code 46A–6D–4(a)(1)(i), (a)(2)(i) (1992).

**31.** This simulated check does not contain any conspicuous language to inform the consumer that it is a non-negotiable instrument. The only evidence to indicate that this "check" cannot be presented to a bank is that the order form to which it is attached states that the "check" is not to be removed, but is to accompany the form when purchasing the candlestick holders, in order to absorb the shipping and handling costs for the bonus heart-shaped dish.

**32.** W.Va.Code 46A–6D–6(a) (1992) provides:

In connection with a consumer transaction, no person may issue any writing which simulates or resembles:

---

## IV.

## SCI'S CHALLENGE TO TEMPORARY INJUNCTION

We earlier placed each of the reasons why SCI contends that the preliminary injunction granted by the circuit court should be dissolved upon this appeal into four categories.[34] However, two categories can be discussed together as they concern whether there was sufficient evidence to support the conclusions from which flowed the temporary injunction that: (1) the Act was violated; and (2) SCI's conduct was unconscionable within the meaning of the West Virginia Consumer Credit and Protection Act and specifically, W.Va. Code 46A–7–110 (1974). We will discuss the evidentiary objections under a singular rubric, and each of the two remaining categories, including the First Amendment and dormant Commerce Clause challenges, will be discussed separately.

### A.

*Sufficiency of Evidence to Support Temporary Injunction Restraining Violations of the West Virginia Consumer Credit Protection Act and the Prizes and Gifts Act*

We have described—with possibly more detail than necessary—how and why the

(a) A check unless the writing clearly and conspicuously disclosed its true value and purpose, and the writing would not mislead a reasonable person. . . .

**33.** While the record may not be as clear as the evidence relating to the sale of the mounted cubic zirconium stone, clutch purse ensembles, and candlestick holders, we would be remiss if we did not make mention of SCI's solicitation in which it represents to consumers that they have won a prize, and then makes use of a 900 telephone number as a means to entice a person into investing up to $8 to claim a prize, since to do so would expedite the receipt of that prize. This scheme requires consumers to expend money in order to receive the prize within ten days, a violation of W.Va.Code 46A–6D–3(a)(2) (1992). *See supra* note 15, for the text of W.Va.Code 46A–6D–3(a)(2) (1992). The record reveals that SCI has refunded the cost of the telephone call when challenged by the Attorney General's office. We doubt that SCI would be so beneficent if it did not share in the profits of the telephone call.

**34.** *See supra* part I.

methods by which SCI attempts to sell its products to West Virginia consumers demonstrate reasonable cause to believe that SCI is either engaging in or is likely to engage in conduct in violation of the Act, and should be restrained in the manner shaped by the terms of the temporary injunction.[35]

■ The West Virginia Prizes and Gifts Act was designed by the West Virginia Legislature to assist in protecting West Virginia citizens from being victimized by misleading and deceptive practices when a seller is attempting to market a product using a prize or gift as an inducement.

The record, which has been developed during the two hearings upon the preliminary injunction and placed before this Court, supports the circuit court's account of the evidence as being plausible when the record is viewed in its entirety. Accordingly, the finding that SCI is engaged in misleading and deceptive practices as enumerated in the temporary injunction order is not clearly erroneous. *See supra* note 6 for Syllabus Point 1, in part, *In the Interest of: Tiffany Marie S.,* 196 W.Va. 223, 470 S.E.2d 177 (1996). SCI asserts that the findings of fact are flawed in that there was not a specific finding that any of the solicitations amounted to material misrepresentations. SCI maintains that when viewing the solicitations in their totality, they contain nothing more than standard puffing and hyperbole that is an acceptable and lawful practice when attempting to sell a product.

The circuit court found, however, and we agree that:

(1) SCI has used official sounding language in violation of W.Va.Code 46A–6D–5 (1992) to misrepresent special selection when, in fact, such letters go to thousands of consumers;

(2) That SCI's mailings deceive recipients as to the value of the prize or the item ordered; and

(3) That consumers mistakenly believe they are obtaining a bargain when, in fact, the fee or charge is often more than what the prize and the purchased item are worth combined.

■ While admittedly these findings do not use the words "material misrepresentation" or "actually misleading," such findings are not a necessary predicate to support a temporary injunction under W.Va.Code 46A–7–110 (1974).

■ It is clear from this record that SCI's solicitations induce a consumer to purchase a product, not necessarily with direct misrepresentations about a product,[36] but with other misleading and deceptive practices which affect the consumer's decision to buy. The misrepresentation of any fact, so long as it materially induces a purchaser's decision to buy, is a deceptive practice under the West Virginia Prizes and Gifts Act. This was the same conclusion reached by the United States Supreme Court in *F.T.C. v. Colgate–Palmolive Co.,* 380 U.S. 374, 387, 85 S.Ct. 1035, 1044, 13 L.Ed.2d 904 (1965), when the Court was analyzing deceptive trade practices under section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1).[37] Reliance on the interpretation of federal consumer protection legislation by federal courts are permissible guidelines under the West Virginia Consumer Credit and Protection Act. *See* W.Va.Code 46A–6–101(1) (1974).

■ We hold that under the West Virginia Prizes and Gifts Act, once the circuit court makes a finding that deceptive practices are used to affect a consumer's decision to purchase a product, then the circuit court is authorized, within the bounds of reason, to infer that the deception will constitute a material factor in a consumer's decision to purchase the product. *See F.T.C. v. Colgate–Palmolive Co.,* 380 U.S. 374, 392, 85 S.Ct.

---

**35.** *See supra* part III.

**36.** However, we are reminded in the cubic zirconium stone solicitation that SCI goes to great efforts to compare the value of its stone with a genuine mined diamond worth several thousand dollars, including appraisals and certificates of authenticity on SCI's ersatz diamonds. *See supra* notes 9, 16.

**37.** 15 U.S.C. § 45(a)(1) (1958 ed.) provided:

Unfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce, are declared unlawful.

1035, 1046–47, 13 L.Ed.2d 904 (1965); *Zauderer v. Office of Disciplinary Counsel,* 471 U.S. 626, 652–53, 105 S.Ct. 2265, 2282–83, 85 L.Ed.2d 652 (1985) (where the possibility of deception is self-evident, extrinsic evidence is not necessary for a finding that materials are misleading).

We next address whether SCI, as a result of its solicitations, has engaged in unconscionable conduct. The circuit court, in denying SCI's motion to dissolve the temporary injunction, concluded that SCI's solicitations constituted unconscionable conduct.[38]

■■■■■ SCI argues that mail solicitations do not place the same amount of pressure as would accompany a personal solicitation, thereby lacking the requisite level of overreaching necessary to constitute unconscionability. We agree that mail solicitations generally subject the consumer to a lesser degree of coercion than face-to-face or even telephone solicitations, *see Shapero v. Kentucky Bar Ass'n,* 486 U.S. 466, 475–76, 108 S.Ct. 1916, 1922–23, 100 L.Ed.2d 475 (1988) (discussing the coercive nature of solicitations in the context of a blanket prohibition on attorney solicitations which were not found to be misleading or deceptive),[39] and, therefore, should be closely scrutinized before concluding that such conduct is unconscionable. Despite this higher level of scrutiny, we believe that SCI has nonetheless engaged in unconscionable conduct through the language and technique of its mail solicitations.

One of the principals of SCI is Benjamin D. Suarez, whose design for a successful sales campaign through mail solicitation is contained in an exhibit introduced during one of the hearings upon the motion for preliminary relief. In his book, *7 Steps to Freedom II: How to Escape the American Rat Race,* Mr. Suarez expresses a recurrent theme of assuring the sale of a product through a mail solicitation by baiting the sale with promises of prizes and rewards and warning the consumers that if they do not purchase a product and respond within a prescribed time period, they risk forfeiture of these prizes and rewards.[40] In a self-fulfilling prophecy,

---

**38.** The order denying SCI's motion to dissolve and modifying the preliminary injunction did not enjoin SCI from engaging in any unconscionable conduct. Insofar as we are able to determine in reviewing the record, the only reason that the circuit court concluded that SCI was engaged in unconscionable conduct, as that term is used in W.Va.Code 46A–7–110 (1974), was to strengthen its resolve in denying SCI's motion to dissolve. Accordingly, we only discuss SCI's challenge within this context.

**39.** However, the United States Supreme Court also acknowledged in *Shapero* that personalized letters present an increased risk of deception and the greater likelihood of coercion. *Shapero v. Kentucky Bar Ass'n,* 486 U.S. 466, 476, 108 S.Ct. 1916, 1923, 100 L.Ed.2d 475 (1988).

**40.** The following are excerpts from the book, Benjamin D. Suarez, *7 Steps to Freedom II: How to Escape the American Rat Race* (1993):

Free Gift Offers/You Won Offers: WARNING

Free Gift/You Won offers where non-buyers qualify to receive the gift can be very powerful sales tools. *But they are often difficult* to use successfully for a number of reasons:

1. *Prospects often respond by requesting the free gifts and not purchasing any product.* Copy should not accentuate responding to receive free gifts *without any obligation whatsoever.* Weave the benefits of the product into your free gift offer.

*Id.* at 2–82 (emphasis added).

What do people expect to get from a "Payments and Settlements Division" of an accounting office? A check for cash, of course. That's why a check pattern and the prospect's name and address show through the envelope window. A small window on the right side shouts out the amount of $789.21. The fact that it's not an even number adds to the realism.

*Id.* at 2–91 to 2–92.

A customer reply envelope is provided, so the prospect does not have a reason for delaying the return of their "Claim Form." This envelope has an urgent, businesslike appearance which compels the prospect to use it immediately. The appearance of the envelope gives prospects a secure feeling that their sweepstakes claims will be properly processed and their merchandise orders will, in fact, be fulfilled.

*Id.* at 2–92.

The key to direct mail success is a presentation that is logical and consistent all the way through the package, that talks personally, one-on-one to the prospect, and that creates a perception of importance, *making the prospect fearful or reluctant to set it aside without acting.*

\* \* \* \* \* \*

The name and address showing through the window look like they are typewritten, *giving a strong impression that the mailing is highly personal....*

Mr. Suarez, through his company, SCI, has made fear and confusion the catalysts to assure a completed sale of whatever product is being peddled.[41]

While we believe that mail solicitations require greater scrutiny than perhaps that of a personal or telephone solicitation, the record which we have reviewed supports the circuit court's conclusion of SCI's unconscionable conduct based upon an examination of the solicitations scheme, as a whole, measured against what Mr. Suarez attempted to accomplish in his manual for a successful sales campaign.[42]

### B.

*Are SCI's Solicitations Protected Under the Commercial Speech Doctrine and Therefore Cannot be Restrained?*

▇ SCI contends that all of its solicitations with potential West Virginia consumers

are protected by the First Amendment to the United States Constitution and Article III, Section 7 of the West Virginia Constitution, and therefore cannot be restrained, and to the extent that the temporary injunction does just that, it cannot be enforced.[43]

In order to fully understand SCI's position on this important constitutional consideration of the temporary injunction, we must briefly examine the evolution of the commercial speech doctrine.[44]

The protection of commercial speech [45] has an erratic history. More than fifty years ago, commercial speech was completely excluded from First Amendment protection. *Valentine v. Chrestensen,* 316 U.S. 52, 62 S.Ct. 920, 86 L.Ed. 1262 (1942); *Breard v.*

---

The overall impression of official starkness *creates an element of fear* in the prospect's mind—"I can't throw this away because there may be official documents, or even money inside. I had better open it now and act on it. *Id.* at 2–98 (emphasis added).

All these elements are very subtle, yet when they are combined, they become extremely powerful—more powerful than a cute sales slogan or artsy design, because there is a high degree of believability.

\*   \*   \*   \*   \*   \*

You would not throw away a deed or your birth certificate, and the prospect would be very hard-pressed to feel comfortable about throwing away this letter. 2–99

\*   \*   \*   \*   \*   \*

Further *urgency* is created with an immediate deadline and a list of simple instructions that must be followed to claim the prize. *Id.* at 2–99 (emphasis added.)

The Reply Envelope is simple, stark, and official-looking. It includes a personal, important-sounding handwritten note that creates a sense of *urgency* for the prospect. *Id.* at 2–100 (emphasis added).

**41.** What comes to mind is:
*Oh, what a tangled web we weave,*
*When first we practise to deceive!*
Sir Walter Scott, *Marmion,* Poetical Works 89, 161 (J. Logie Robertson ed., 1967).
It is the tangled web of the total SCI sales campaign that the circuit court found to be unconscionable.

**42.** We note that at least one other state explicitly provides that a violation of its prizes and gifts laws constitutes an unconscionable act or practice without distinguishing between written and oral solicitations. *See* Kan.Stat.Ann. § 50–692(g) (1994) ("Any violation of [the Prize Notification] section is an unconscionable act or practice under the Kansas consumer protection act.").

**43.** The First Amendment to the United States Constitution and Article III, Section 7 of the West Virginia Constitution are virtually identical in pertinent parts. Both constitutional provisions prohibit the making of any law abridging the freedom of speech or of the press. For purposes of this opinion, we use the First Amendment to the United States Constitution and Article III, Section 7 of the West Virginia Constitution interchangeably. Article I, Section 1 of the West Virginia Constitution recognizes that the United States Constitution shall be the supreme law of the land. Accordingly, the decisions of the United States Supreme Court interpreting the First Amendment are binding on this Court and, consequently, will be used throughout our discussion of this issue. *See Pushinsky v. West Virginia Bd. of Law Examiners,* 164 W.Va. 736, 744, 266 S.E.2d 444, 449 (1980).

**44.** We need not encumber this opinion with a lengthy discussion as to whether the speech which SCI claims is constitutionally protected is "commercial" as opposed to "non-commercial" or "pure" speech. Our review of the record, combined with the absence of any serious contention by SCI to the contrary, convinces us that the speech in this case does "no more than propose a commercial transaction." *See Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations,* 413 U.S. 376, 385, 93 S.Ct. 2553, 2558, 37 L.Ed.2d 669 (1973). Accordingly, we apply First Amendment jurisprudence concerning commercial speech.

**45.** An acceptable working definition of commercial speech is offered in *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 762, 96 S.Ct. 1817, 1825–26, 48 L.Ed.2d 346 (1976), as speech which does " 'no more than propose a commercial transaction,' is so removed from any 'exposition of ideas,' and from ' "truth, science, morality, and

*City of Alexandria,* 341 U.S. 622, 71 S.Ct. 920, 95 L.Ed. 1233 (1951). Several decisions which followed *Valentine* and *Breard,* including *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations,* 413 U.S. 376, 93 S.Ct. 2553, 37 L.Ed.2d 669 (1973), and *Bigelow v. Virginia,* 421 U.S. 809, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975), consider the exclusion of First Amendment protection of commercial speech of doubtful validity.[46]

In 1976, the Court in *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976), without expressly overruling either *Valentine* or *Breard,* held that commercial speech did not lack First Amendment protection. The cycle of commercial speech jurisprudence was completed in 1980 with the Court's decision in *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n,* 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980), in which the Court promulgated a four-part test for analyzing commercial speech cases.[47]

*Application of the Central Hudson Test*

In order to determine whether the text of the communications between SCI and its tar-

geted consumers in West Virginia is entitled to any free speech protection within the meaning of the commercial speech doctrine, we are required to apply the four-step analysis mandated in *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of New York,* 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980).

What distinguishes the attack raised by SCI in this case from the typical commercial speech case, which concentrates on the governmental restriction expressed in a statute or regulation, is that SCI is not directly opposing the language or the provisions of the Prizes and Gifts Act. Instead, SCI confines its objections to the terms of the temporary injunction, which restricts its right to communicate with its customers and is therefore a violation of the First Amendment as applied to SCI. Accordingly, we will apply the *Central Hudson* four-part test to the terms of the temporary injunction to determine whether or not they improperly restrict SCI's right to sell its product through direct mail solicitation.

arts in general, in its diffusion of liberal sentiments on the administration of Government." ' " *Id.* (citations omitted).

**46.** *See Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 759 & n. 16, 96 S.Ct. 1817, 1824 & n. 16, 48 L.Ed.2d 346 (1976) for a careful analysis of the erosion of the denial of any protection for commercial speech.

**47.** There are many variations of the commercial speech doctrine expressed in a number of decisions by the United States Supreme Court, *e.g., Ohralik v. Ohio State Bar Ass'n,* 436 U.S. 447, 98 S.Ct. 1912, 56 L.Ed.2d 444 (1978) (recognizing that commercial speech has a limited measure of protection commensurate with its subordinate position in the scale of First Amendment values); *Zauderer v. Office of Disciplinary Counsel,* 471 U.S. 626, 105 S.Ct. 2265, 85 L.Ed.2d 652 (1985) (governments are free to prevent the dissemination of commercial speech that is false, deceptive or misleading); *Posadas de Puerto Rico Assoc. v. Tourism Co.,* 478 U.S. 328, 106 S.Ct. 2968, 92 L.Ed.2d 266 (1986) (where the underlying interest should not be protected, *i.e.,* casino gambling, the speech relating to that activity should not be protected); *City of Cincinnati v. Discovery Net-*

*work, Inc.,* 507 U.S. 410, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993) (clarifying and reenforcing the four-prong test originally announced in *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of New York,* 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980)). Also, there are extant a number of scholarly comments and criticisms of the commercial speech doctrine and its contemporary relevance. *See* Alex Kozinski & Stuart Banner, *Who's Afraid of Commercial Speech?,* 76 Va.L.Rev. 627 (1990); David F. McGowan, Comment, *A Critical Analysis of Commercial Speech,* 78 Cal.L.Rev. 359 (1990); *The Supreme Court—Leading Cases,* 107 Harv.L.Rev. 144, 234 (1993). The cases and scholarly articles are helpful in understanding the depth of the commercial speech doctrine; however, for purposes of this opinion, the recognition of First Amendment protection to commercial speech as pronounced in *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976), and the four-part test for analyzing commercial speech cases as articulated in *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of New York,* 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980), are sufficient precedents to address SCI's First Amendment concerns vis-à-vis the temporary injunction.

Prior to commencing our *Central Hudson* analysis, we cannot forget the standard of proof which we have previously established to issue a temporary injunction under W.Va. Code 46A–7–110 (1974). In order to temporarily restrain SCI's solicitation of West Virginia customers in a manner that we have described, the Attorney General must only prove by minimal evidence that the language of the solicitations brings a violation of the Prizes and Gifts Act in view.

■ With this standard as a guide, we apply *Central Hudson*. The four steps in *Central Hudson* to determine the constitutionality of any restriction or regulation of commercial speech are as follows:

(1) The speech must concern lawful activity and not be misleading.

(2) Whether the State has a substantial interest in restricting the speech.

(3) Does the restriction directly advance the State's interest? (and)

(4) Is there a reasonable fit between the regulation and the State's interest? [48]

*Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of New York*, 447 U.S. 557, 564, 100 S.Ct. 2343, 2350, 65 L.Ed.2d 341 (1980).

The first step of *Central Hudson* is nothing more than an extension of the holding in *Virginia State Bd. of Pharmacy*, which extended First Amendment protection to commercial speech, but refused to extend that protection to deceptive commercial speech. *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 771, 96 S.Ct. 1817, 1830, 48 L.Ed.2d 346

(1976) ("Obviously, much commercial speech is not provably false ... but only deceptive or misleading. We foresee no obstacle to a State's dealing effectively with this problem.") This concept was then incorporated as step one in the *Central Hudson* test: "[f]or commercial speech to come within [First Amendment protection], it at least must concern lawful activity and not be misleading." *Central Hudson*, 447 U.S. at 566, 100 S.Ct. at 2351.

As we have detailed at some length in prior portions of this opinion, we agree with the circuit court's findings that SCI's solicitations, particularly in the sale of the cubic zirconium stones, clutch purses, and crystal candlesticks were misleading and deceptive.[49] We therefore need to go no farther in our analysis since upon the finding of deceptive solicitation there is nothing within the communications between SCI and the targeted West Virginia consumer which is protected under the First Amendment.

We recognize that the effect of the temporary injunction is to impose prior restraints upon SCI's method and manner of selling its product to West Virginia consumers. Many courts have found repugnant any prior restraints on noncommercial speech, as well as certain types of commercial speech. *Organization for a Better Austin v. Keefe*, 402 U.S. 415, 419, 91 S.Ct. 1575, 1578, 29 L.Ed.2d 1 (1971) ("Any prior restraint on expression comes to this Court with a 'heavy presumption' against its constitutional validity."); *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976). However, there is not a similar reluctance to uphold a prior restraint on misleading or deceptive speech. *See United States Postal Serv. v. Athena Products, Ltd.*, 654 F.2d 362

---

**48.** This fourth step has undergone some transformation since *Central Hudson* was published in 1980. In *Central Hudson*, the court indicated that a restriction which met the first three factors of the commercial speech analysis but was not the least restrictive means available should be held unconstitutional. *See Central Hudson*, 447 U.S. at 564, 100 S.Ct. at 2350. However, writing for the Court in *Board of Trustees v. Fox*, 492 U.S. 469, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989), Justice Scalia indicates that the test is not as restrictive as the language appears to indicate. Rather, the test was one of a reasonable " ' "fit" between the legislature's ends and the means

chosen to accomplish those ends.' " *Id.* at 480, 109 S.Ct. at 3035 (quoting *Posadas de Puerto Rico v. Tourism Co.*, 478 U.S. 328, 341, 106 S.Ct. 2968, 2977, 92 L.Ed.2d 266 (1986). This reasonable "fit" standard appears to be the new fourth prong of the *Central Hudson* formulation. *See* Todd J. Locher, Comment, *Board of Trustees of the State University of New York v. Fox: Cutting Back on Commercial Speech Standards*, 75 Iowa L.Rev. 1335 (1990).

**49.** *See supra* part III.

(5th Cir.1981), *cert. denied,* 456 U.S. 915, 102 S.Ct. 1768, 72 L.Ed.2d 173 (1982).

■■■■ As we have stated, the West Virginia Legislature, in W.Va.Code 46A–7–110 (1974), has empowered the Attorney General to obtain a temporary injunction against any conduct which provides reasonable cause to believe that there is either a violation of the Prizes and Gifts Act or that there is likely to be a violation of the Act. We hold that the Legislature is accorded considerable deference in restricting and regulating solicitations which are or may be deceptive or misleading, even to the extent of permitting prior restraints upon the deceptive solicitation. W.Va.Code 46A–7–110 (1974), as applied to the facts of this case, does not trespass upon First Amendment values.

While SCI does not specifically object to the absence of any time constraints within the injunction, we are troubled by any prior restraint that may extend longer than is necessary to effect the purpose of the Act. While the State has the right in this case to restrain deceptive commercial speech under the standard of proof required for a temporary injunction under W.Va.Code 46A–7–110 (1974), the restrictions imposed within the temporary injunction should not endure longer than is necessary to bring this matter to a final conclusion. Accordingly, we shall modify the temporary injunction by limiting it to a period not to exceed one hundred eighty (180) days after the mandate of this Court is issued.

### C.

*Does the Temporary Injunction Violate the Dormant Commerce Clause?*

SCI argues that the Prizes and Gifts Act as applied to it under the facts of this case violates United States Constitution, Article I, Section 8.[50]

**50.** U.S. Const., Art. I, § 8 provides in pertinent part:

The Congress shall have Power ... [t]o regulate Commerce with foreign Nations and among the several States, and with the Indian Tribes.

**51.** This doctrine is known both as the negative and dormant Commerce Clause. Since SCI has

The central theme of this argument is that West Virginia, as expressed through the temporary injunction restraining SCI from specified business practices in violation of the Prizes and Gifts Act, is interfering with interstate commerce. SCI contends that West Virginia is interfering with interstate commerce in two ways. First, since no West Virginia residents were among the defendants named in the original and amended complaint, then by implication West Virginia is favoring West Virginia businesses. Second, West Virginia is enforcing the Prizes and Gifts Act in such a manner that it imposes a burden on interstate commerce that exceeds its supposed purpose. We reject both contentions.

Nothing in the Commerce Clause of the United States Constitution expressly restricts the power of a State to regulate a subject of interstate commerce. Emerging, however, from the absence of any language explicitly limiting a State's power to interfere with interstate commerce is the doctrine linked to the Constitution's silence known as the negative or dormant Commerce Clause.[51]

■■■■ The dormant Commerce Clause is a judicially framed doctrine that no State has the unlimited, unrestricted power to interfere with the flow of interstate commerce. In other words, through a series of decisions, the United States Supreme Court has developed a rule that no State may legislate that certain products may not enter through its borders. *See H.P. Hood & Sons, Inc. v. Du Mond,* 336 U.S. 525, 69 S.Ct. 657, 93 L.Ed. 865 (1949); *City of Philadelphia v. New Jersey,* 437 U.S. 617, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978). While the doctrine expressed as the dormant Commerce Clause has been sharply criticized both in case and scholarly comment, it survives to the extent we must respond to its application to the facts of this case.[52]

chosen to use the term "dormant," we will remain consistent and use the same term.

**52.** In *Tyler Pipe Indus., Inc. v. Washington State Dep't of Revenue,* 483 U.S. 232, 107 S.Ct. 2810, 97 L.Ed.2d 199 (1987), Justice Scalia observed:

The fact is that in 114 years since the doctrine of the negative Commerce Clause was formally adopted as holding of this Court, and

The modern dormant Commerce Clause analysis examines State action within the context of impacting interstate commerce on two levels. First is a *per se* rule of invalidity which considers any State law which has the effect of placing the State in a position of "economic isolation." "Thus, where simple economic protectionism is effected by state legislation, a virtually *per se* rule of invalidity has been erected." *City of Philadelphia v. New Jersey,* 437 U.S. at 624, 98 S.Ct. at 2535.

The second level of judicial review recognizes that when a State acts to safeguard the health, safety, and welfare of its citizens, then, inevitably, there will be incidental burdens on interstate commerce which may be unavoidable. In these situations, the Court has adopted a more flexible approach by framing a balancing test which is best described in *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970) as:

> Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.... If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.

As we have indicated, SCI contends that the temporary injunction constitutes "simple economic protectionism," since no West Virginia-based business is included in the universe of defendants whose mail solicitations are being scrutinized. SCI is not criticizing the Prizes and Gifts Act as not being worded in a manner that is even-handed to effectuate a legitimate local purpose;

instead it is asserting that the manner in which the Act is enforced is a de facto economic blockade of out-of-state businesses. We find nothing in this record to support a purposeful or even incidental exclusion of West Virginia businesses who are engaged in the same or similar activities as SCI.

We can only speculate that the reason the Attorney General did not join any West Virginia-based businesses was either (1) there are no businesses in West Virginia engaged in the same or similar business activities; or (2) if there are West Virginia businesses who are engaged in the same or similar business activity, then their method of doing business does not follow the same business practices as the out-of-state businesses, including SCI.

In any event, the burden of producing some credible evidence suggesting a selective enforcement of the Act would be on SCI, which it has failed to sustain.

Finally, SCI contends that even if the Act is non-discriminatory, both in terms of language and enforcement, the Act as applied to SCI imposes a burden on interstate commerce that exceeds its putative purpose and is therefore invalid. This argument requires the application of the balancing test outlined in *Pike v. Bruce Church, Inc., supra.*

SCI complains that while the Act properly promotes West Virginia's legitimate interest in protecting its citizens against misleading and deceptive sales techniques, the injunction goes too far in its reach by prohibiting not only deceptive and misleading solicitations in violation of the Act, but also representations that are wholly truthful. The breadth of the injunction, argues SCI, is "clearly excessive in relation to the putative local benefits" and thus fails the balancing test in *Pike v. Bruce Church, Inc., supra.*

The fallacy in SCI's position is that the only conduct which is restrained by the tem-

---

in the 50 years prior to that in which it was alluded to in various dicta of the Court, our applications of the doctrine have, not to put too fine a point on the matter, made no sense. *Id.* at 259–60, 107 S.Ct. at 2826 (Scalia, J., concurring, in part, and dissenting, in part) (citations omitted).

There is also a substantial body of scholarly comment and criticism of the dormant Commerce Clause. One of the more exhaustive treatments of this subject is Patrick C. McGinley, *Trashing the Constitution: Judicial Activism, the Dormant Commerce Clause, and Federalism Mantra,* 71 Or.L.Rev. 409 (1992).

**364**

porary injunction is conduct which violates the Act. There is nothing within the four corners of the temporary injunction which prevents SCI from engaging in mail solicitation in a manner which does not violate the Act. The only burden imposed upon SCI by the temporary injunction is to avoid engaging in unlawful conduct. That is not a burden imposed on interstate commerce which exceeds the benefits of the Act, it is a burden that is totally contemplated by the Act.

The temporary injunction does not violate the dormant Commerce Clause.

## V.

### CONCLUSION

We have reviewed the temporary injunction issued by the circuit court exclusively within the perspective of W.Va.Code 46A–7–110 (1974), which manages the temporary enforcement of the Prizes and Gifts Act until a final hearing can be conducted on the merits of all the relief sought in the amended complaint.

Measured by the standards introduced in this opinion for reviewing a temporary injunction under W.Va.Code 46A–7–110 (1974), we find that the Attorney General has offered sufficient evidence to establish reasonable cause to believe that SCI is engaging in or is likely to engage in conduct proscribed by the Prizes and Gifts Act. For this reason, the decision of the Circuit Court of Kanawha County granting the temporary injunction is affirmed, with the modification that its terms shall remain in effect for a period not to exceed one hundred eighty (180) days from and after the mandate of this Court.[53]

Affirmed, as modified.

MILLER, Retired Justice, sitting by temporary assignment.

ALBRIGHT, J., did not participate.

---

**53.** We realize that this time period may be arbitrary, particularly in view of the failure to raise this issue below. Accordingly, the time period may be extended by the trial court in its unfettered discretion.