479 S.E.2d 317

**LAWYER DISCIPLINARY
BOARD, Complainant,**

v.

**Phillip B. ALLEN, John P. Coale, and
Greta Van Susteren, Respondents.**

No. 22700.

Supreme Court of Appeals of
West Virginia.

Submitted Sept. 10, 1996.

Decided Nov. 15, 1996.

Sherri D. Goodman, Office of Disciplinary Counsel, Charleston, for Complainant.

David Burton, Burton & Kilgore, Princeton, for Respondents, John P. Coale and Greta Van Susteren

ALBRIGHT, Justice:

Respondents Phillip B. Allen, John P. Coale, and Greta C. Van Susteren are lawyers who are not admitted to practice law in West Virginia. They have been charged with six counts of violating the West Virginia Rules of Professional Conduct through their improper attempt to solicit clients in West Virginia. The Hearing Panel Subcommittee of the Lawyer Disciplinary Board of the State of West Virginia recommended that this Court [1]

---

1. The Honorable Arthur M. Recht resigned as Justice of the West Virginia Supreme Court of Appeals effective October 15, 1996. The Honor- able Gaston Caperton, Governor of the State of West Virginia, appointed him Judge of the First Judicial Circuit on that same date. Pursuant to

sanction respondents by prohibiting them from soliciting cases in West Virginia and prohibiting their appearance in any court within the State of West Virginia for the period of one year. The Subcommittee further recommended that no associate of Phillip B. Allen, and no associate, partner, or member of the firm of Coale & Van Susteren, be permitted to solicit cases in West Virginia or appear in any court in West Virginia for the same period, so long as such attorney maintains a professional relationship with Phillip B. Allen or with the firm of Coale & Van Susteren. While we find that respondents' conduct violated several Rules of Professional Conduct, we reluctantly dismiss the charges against them based upon our conclusion that this Court, at the time of respondents' conduct, subjected to professional discipline only those persons who "regularly engaged in the practice of law" in West Virginia.

### FACTS

At the time of the complained of conduct in this case, Phillip B. Allen, John P. Coale, and Greta C. Van Susteren were engaged in the practice of law in a professional corporation known as Coale, Allen & Van Susteren, which maintained an office in Washington, D.C. Respondent Coale held a 40% interest in the firm and respondent Van Susteren held a 30% interest in the firm. The record does not disclose the amount of Mr. Allen's interest in the firm.

On May 3, 1993, the West Virginia State Bar received a complaint against the law firm of Coale, Allen & Van Susteren and Ted Dickenson individually.[2] An investigation followed, and on April 30, 1994, the Investigative Panel of the West Virginia State Bar Committee on Legal Ethics (now Lawyer Disciplinary Board) concluded that a sufficient factual basis existed to provide good cause to file charges and to refer the matter to a Hearing Panel Subcommittee for a prompt hearing.

A statement of charges against Allen, Coale, and Van Susteren, containing six counts of misconduct, was issued on January 10, 1995, and filed with this Court on January 20, 1995. The statement alleged that Phillip B. Allen was licensed to practice in Ohio and Illinois and that John P. Coale and Greta C. Van Susteren were licensed to practice in the District of Columbia.

Count I of the statement alleged that T.W. Roberts, an investigator employed or retained by respondents, contacted Kathleen Shepherd at her residence in West Virginia by telephone on February 12, 1993, one day after her husband was killed in a vehicular accident. Mrs. Shepherd gave the phone to her son, Michael. Mr. Roberts asked Michael Shepherd to consider the law firm of Coale, Allen & Van Susteren if the family intended to file a lawsuit arising from Mr. Shepherd's death. On February 19, 1993, Mr. Roberts sent a Federal Express letter and firm brochure to Michael Shepherd in West Virginia. A document in the package referred to the law firm members as "trial specialists." It was further alleged in Count I that Mr. Roberts made additional calls to the Shepherd family, including a conference call in which respondent Allen participated. Due to this conduct, respondents were charged with violating Rules 7.3(a), 8.4(a) and 7.4 of the West Virginia Rules of Professional Conduct.

Count II alleged that in November, 1992, two or three days after her husband was severely burned in an industrial accident, Mrs. Scarlett Mayles received a telephone call from Ted Dickenson, who identified himself as being associated with the law firm of Coale, Allen & Van Susteren. Although Mr. Dickenson is not a lawyer, the statement of charges alleges that he did not make that fact clear to Mrs. Mayles. The charges further allege that Mr. Dickenson told Mrs. Mayle that she needed a lawyer immediately and suggested that she hire Coale, Allen & Van Susteren. Mr. Dickenson asked to meet

---

an administrative order entered by this Court on October 15, 1996, Judge Recht was assigned to sit as a member of the West Virginia Supreme Court of Appeals commencing October 15, 1996, and continuing until further order of this Court.

**2.** The individual submitting the complaint believed that Ted Dickenson was a lawyer. However, the subsequent investigation revealed that he was not a lawyer.

with Mrs. Mayle, either at her home or at the hospital in Pittsburgh, where her husband was in intensive care. During the course of the conversation, Mr. Dickenson allegedly stated that his firm was better than any others. When Mrs. Mayle met with Mr. Dickenson and another man claiming to be from Coale, Allen & Van Susteren at the hospital, she informed Mr. Dickenson that she had decided to hire local counsel in Morgantown. Mr. Dickenson advised her not to hire any "rinky-dink" lawyers in Morgantown because they did not know what they were doing. Mr. Dickenson then requested permission to meet with Mr. Mayle. Mrs. Mayle denied the request. With regard to Count II, respondents were charged with violating Rules 7.3(a), 8.4(a) and 7.1(c) of the Rules of Professional Conduct.

Count III alleged that in 1990, Ted Dickenson contacted Mr. Charles Tamasca by telephone in West Virginia approximately six weeks after Mr. Tamasca's son was killed in an airplane crash. Although the crash occurred in Pennsylvania, Mr. Tamasca and his son were both residents of West Virginia, and the private rental plane involved in the accident was owned by a West Virginia Corporation. Mr. Dickenson asked Mr. Tamasca whether he had hired an attorney to file a wrongful death action and encouraged him to consider hiring Coale, Allen & Van Susteren. The charge further alleged that Mr. Dickenson called Mr. Tamasca several times and that Mr. Tamasca ultimately hired Coale, Allen & Van Susteren. Respondents were charged with violating Rules 7.3(a) and 8.4(a) of the Rules of Professional Conduct with regard to Count III.

Count IV alleged that in March, 1992, Mrs. Lenier Baird was contacted in West Virginia by Mr. Tyrone Roberts shortly after her husband was killed in a mining accident. The contact was followed by a letter which thanked Mrs. Baird for "speaking with Mr. Tyrone Roberts...." The letter also stated "our firm specializes in cases like yours." The letter was accompanied by a general letter regarding mining accident claims,

which made references to the firm members as being trial specialists. Respondents were charged with violating Rules 7.3(a), 8.4(a) and 7.4 of the Rules of Professional Conduct regarding this count.

Count V alleged that in March, 1992, within twenty-four hours of her husband's death in a mining accident, Mrs. Linda L. Moran received a phone call at her residence in West Virginia from a representative of Coal, Allen & Van Susteren. The male caller encouraged her to hire Coal, Allen & Van Susteren. Mrs. Moran explained that she did not wish to talk at that time. Thereafter, Mrs. Moran received unsolicited written materials about the firm and five or six additional telephone calls. The last call she received was from Mr. Dickenson. Respondents were charged with violating Rules 7.3(a), 8.4(a) and 7.3(b)(1) of the Rules of Professional Conduct.

Count VI alleged that in March, 1992, the day after his brother, Don, was killed in a mining accident, David Glaspell received a telephone call from a representative of Coale, Allen & Van Susteren, who wanted to reach Don Glaspell's widow. The caller requested permission to send written material to Mr. Glaspell and asked that he forward the material to Mrs. Glaspell. Mr. Glaspell agreed to do this, and Mrs. Glaspell eventually hired respondents' firm. With regard to Count VI, respondents were charged with violating Rule 7.3(a) of the Rules of Professional Conduct.

After respondents initially refused to accept service of the statement of charges, their counsel accepted service on their behalf on March 1, 1995. On March 23, 1995, respondents Coale and Van Susteren [3] filed a motion to dismiss/strike and sever, which challenged the Board's jurisdiction, along with their first request for discovery. Thereafter, a telephone status conference regarding the motion to dismiss was held before Alan D. Moats, Chairman of the Hearing Panel Subcommittee. Disciplinary counsel

---

**3.** Respondent Allen failed to answer interrogatories, and, with the exception of two pre-hearing teleconferences, he has not participated in this case. Therefore, unless otherwise indicated, from this point forward when we refer to respondents we refer only to Mr. Coale and Ms. Van Susteren.

asked that the discovery request be stayed, pending a ruling on the motion to dismiss. After counsel for respondents Coale and Van Susteren expressed his concern regarding a stay, Chairperson Moats explained that he would allow sufficient time for the parties to properly represent themselves. By order dated June 2, 1995, respondents' motion to dismiss was denied and disciplinary counsel was directed to schedule a prehearing conference to establish a discovery schedule, to set a hearing date, and to address any additional motions.

Disciplinary counsel submits that during the first part of July, 1995, her assistant attempted to schedule a hearing date but encountered difficulty. Disciplinary counsel asserts that it would have been difficult to set discovery and motions schedules without a hearing date from which to work backwards. Thus, no formal discovery schedule was prepared. However, on July 26, 1995, disciplinary counsel responded to the first discovery request submitted by respondents Coale and Van Susteren. On September 1, 1995, disciplinary counsel served respondents Coale and Van Susteren with her first discovery request. Respondents filed their responses on October 3, 1995, which merely objected to every interrogatory and request on the basis that they were untimely under Rule 3.4 of the West Virginia Rules of Disciplinary Procedure.[4] They also filed a second motion to dismiss, in which they claimed that the statement of charges should be dismissed because the Clerk of the Supreme Court of Appeals failed to schedule a hearing within 120 days of the filing of the statement of charges, as required by Rule 3.4 of the Rules of Lawyer Disciplinary Procedure.

On November 8, 1995, a telephonic hearing to address the various motions filed by the parties was held. Two of the three Subcommittee members assigned to the case participated in the hearing.[5] At the beginning of the hearing, counsel for respondents Coale and Van Susteren preserved his objections to the hearing for lack of a quorum and because they had previously requested that the hearing be in person. The Subcommittee did not rule on the objections. Shortly thereafter, respondents' counsel asked the Subcommittee if it had denied the motion for an in-person hearing, and Chairman Moats confirmed that the motion had been denied. Counsel then stated, "I would like to point out the [sic] rule 3.2 of the Rules of Lawyer Disciplinary Procedure require [sic] that three members of the Hearing Panel Subcommittee shall constitute a quorum." Counsel then began a discussion of his motion to dismiss, which was subsequently denied.

A hearing on the statement of charges was held on January 4, 1996, before all three members of the Hearing Panel Subcommittee. Respondent Phillip B. Allen was not present and was not represented by counsel.[6] Respondents Coale and Van Susteren were not present in person, but were represented by counsel. At the beginning of the hearing, disciplinary counsel raised the issue of her motion to compel respondents to properly respond to her discovery request, which had been filed on January 3, 1996. Counsel for respondents objected on the grounds that the hearing on the statement of charges was not the appropriate forum in which to address the motion and that it was untimely. Chairperson Moats granted the motion.[7]

Counsel for respondents Coale and Van Susteren then renewed their motion to dismiss on jurisdictional grounds; on due pro-

<hr>

4. Disciplinary counsel received respondents Coal and Van Susteren's amended response to her interrogatories on November 27, 1995. However, some of counsel's requests remained unanswered. Respondent Allen failed to answer the interrogatories and never submitted any reason for such failure.

5. Subcommittee Chairperson Alan D. Moats and Subcommittee member R. Kemp Morton, participated in the teleconference. Subcommittee member Priscilla Haden did not participate.

6. Respondent Allen notified the Subcommittee Chairperson that he was financially unable to travel from California to attend the hearing. The Chairperson directed that Mr. Allen be provided with a copy of the transcript from the hearing and that he be afforded thirty days to offer any evidence to the Subcommittee. Mr. Allen did not offer any evidence.

7. Disciplinary counsel subsequently received respondents' supplemental response to the interrogatories on January 17, 1996.

cess grounds due to the timeliness of the proceedings, latches, and because the Disciplinary Board "successfully lobbied" to change Rule 1 of the Rules of Lawyer Disciplinary Procedure; and for the failure to have a quorum present at the prehearing conferences. Chairperson Moats overruled respondents' objection pertaining to Rule 1 on the basis that the Supreme Court has always had inherent authority to oversee and supervise attorneys practicing law in West Virginia. He also overruled the remaining objections and explained that the entire Hearing Panel had reviewed his previous rulings on such objections.

Disciplinary counsel then presented her evidence, during the course of which she briefly testified for the purpose of authenticating a letter she received from respondent Allen. Respondents Coale and Van Susteren preserved an objection to this testimony, which forms one of the grounds for objection to the recommendations of the Board now before the Court. No evidence was presented on behalf of respondents Coale and Van Susteren or on behalf of respondent Allen. Following the conclusion of the hearing, closing arguments were submitted in writing.

Thereafter, on April 18, 1996, the Subcommittee's findings of fact, conclusions of law, and recommendation concerning discipline was filed with this Court. The Subcommittee found that all three respondents had violated Rules 7.3(a), 8.4(a), 7.4, 7.1 and 7.3(b)(1) of the Rules of Professional Conduct and recommended the sanctions previously described.

## STANDARD FOR REVIEW

■ A *de novo* standard applies to a review of the adjudicatory record made before the Committee on Legal Ethics of the West Virginia State Bar as to questions of law, questions of application of the law to the facts, and questions of appropri-

ate sanctions; this Court gives respectful consideration to the Committee's recommendations while ultimately exercising its own independent judgment. On the other hand, substantial deference is given to the Committee's findings of fact, unless such findings are not supported by reliable, probative, and substantial evidence on the whole record.

Syl. pt. 3, *Committee on Legal Ethics of the West Virginia State Bar v. McCorkle*, 192 W.Va. 286, 452 S.E.2d 377 (1994).

## VIOLATION OF RULES THROUGH SOLICITATION

■ In keeping with our holding in syllabus point 3 of *Committee on Legal Ethics of the West Virginia State Bar v. McCorkle, Id.,* substantial deference is given to the findings of fact of the Lawyer Disciplinary Board (formerly the Committee on Legal Ethics of the West Virginia State Bar), unless such findings are not supported by reliable, probative, and substantial evidence on the whole record.

Having reviewed completely the record made in the hearings of the Board in the cause before us, and after having given due consideration to the objections to the evidence raised by respondents, we are fully satisfied that reliable, probative, and substantial evidence supports the conclusion that respondents Phillip B. Allen, John P. Coale, and Greta Van Susteren violated Rule 7.3(a) of the Rules of Professional Conduct,[8] adopted by this Court to govern the practice of law in this State, on at least six different occasions. We are also satisfied that the evidence supports the conclusion that those respondents violated Rule 8.4(a) of the Rules of Professional Conduct[9] on as many as five of those occasions. We find from that evidence that the violations arose from a settled practice, running from November, 1990 to March, 1993, of soliciting professional em-

---

8. Rule 7.3(a) states:
 (a) A lawyer shall not by in-person or telephone contact solicit professional employment from a prospective client with whom the lawyer has no family or prior professional relationship when a motive for the lawyer's doing so is the lawyer's pecuniary gain.

9. Rule 8.4(a) states:

 It is professional misconduct for a lawyer to:
 (a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another.

ployment by telephone contact, usually through other persons respondents knowingly induced to act in their behalf. We are satisfied that this conduct was for respondents' pecuniary gain and involved prospective clients with whom the lawyers had no family or prior professional relationship.

From the evidence, we believe that three of the incidents involving telephone solicitations were particularly egregious because they commenced within one to three days after a spouse of the prospective clients had been killed or seriously injured. To compound the seriousness of the conduct, the caller in one of the telephone solicitations persisted and made five or more follow-up calls after the prospective client made known that she did not wish to be contacted. We believe such evidence was sufficient to support a finding that respondents also violated Rule 7.3(b)(1) of the Rules of Professional Conduct.[10] In addition, on one occasion the representative of Coale, Allen & Van Susteren made a comparative remark regarding other law offices in West Virginia, which, at the least, has no basis in fact and, viewed in the light of the civility appropriate to the practice of law and the distressed circumstances of the prospective client at the time, is plainly improper, even for those competing for clients in marketplace. The evidence of this conduct supports the Board's finding that Rule 7.1(c) of the Rules of Professional Conduct[11] was violated. While we recognize that this comparative remark was made outside our State, in a hospital in Pittsburgh, we note that it was a continuation of contact that was initially made to an individual in West Virginia. Furthermore, the comment was made with regard to lawyers who practice in West Virginia and was related to possible litigation cognizable by our courts. Thus, we hold that a lawyer who initially contacts a prospective client who is located in West Virginia regarding a cause of action that may be initiated in West Virginia courts is subject to discipline in this State if he or she violates the West Virginia Rules of Professional Conduct with respect to such prospective client, even if the conduct constituting a violation occurs outside of our State.

We will shortly address the many faceted defenses raised by respondents to these and the other charges brought to us in this case. However, after completing a thorough and, we trust, sensitive review of the entire record in the preparation of this opinion, we state our firm conviction that lawyers should not, directly or through others, burden our citizens with telephone solicitations of this nature, especially in the circumstances and time frames found in this case. We state that conviction first for the protection of the very citizens for whom lawyers work. We state it also on behalf of civility and common decency. Finally, we state that conviction because we believe it to be in keeping with the public policy of this State[12] and in keeping with the respect our citizens show those in distress or sorrow.

## TELEPHONE SOLICITATION

Respondents argue that the Hearing Panel erred in finding that they should be disci-

---

**10.** Rule 7.3(b)(1) states:

(b) A lawyer shall not solicit professional employment from a prospective client by written or recorded communication or by in-person or telephone contact even when not otherwise prohibited by paragraph (a), if:

(1) the prospective client has made known to the lawyer a desire not to be solicited by the lawyer....

**11.** Rule 7.1(c) states:

A lawyer shall not make a false or misleading communication about the lawyer or the lawyer's services. A communication is false or misleading if it:

\* \* \* \* \* \*

(c) compares the lawyer's services with other lawyer's services, unless the comparison can be factually substantiated.

**12.** *Cf.* W.Va.Code § 55–7–11a, prohibiting the initiation of settlement negotiations or releases of liability within twenty days of the personal injury of a person confined to a hospital or partially or wholly unable to engage in his usual occupation. While this statute is not totally apposite to the circumstances here, we find the statute instructive of a public policy concern regarding undue influence in cases of serious injury. We also note that in Count II of the statement of charges, respondents sought contact with a prospective client who was, at the time of the solicitation, in intensive care in a hospital.

plined because the alleged telephone solicitations, which formed the basis of the charges of misconduct, were commercial speech that is entitled to protection under the First Amendment to the United States Constitution and may not be the subject of discipline.[13] Respondents contend that telephone calls are more like the targeted mailings that were found to be protected by the First Amendment to the United States Constitution in *Shapero v. Kentucky Bar Association,* 486 U.S. 466, 108 S.Ct. 1916, 100 L.Ed.2d 475 (1988). Respondents raise a like argument regarding their alleged violation of Rule 7.4 of the Rules of Professional Conduct, which we will later address. We turn first to the issue of telephone solicitation and commercial speech.

We believe that *Central Hudson Gas v. Public Service Com'n of New York,* 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980), sets forth the proper analysis for determining this issue:

> Under *Central Hudson,* the government may freely regulate commercial speech that concerns unlawful activity or is misleading. [*Central Hudson*] at 563–564, 100 S.Ct., at 2350. Commercial speech that falls into neither of those categories ... may be regulated if the government satisfies a test consisting of three related prongs: first, the government must assert a substantial interest in support of its regulation; second, the government must demonstrate that the restriction on commercial speech directly and materially advances that interest; and third, the regulation must be " 'narrowly drawn,' " *id.,* at 564–565, 100 S.Ct., at 2350–51.

*Florida Bar v. Went for It, Inc.,* 515 U.S. 618, ——, 115 S.Ct. 2371, 2376, 132 L.Ed.2d 541, 549 (1995). *See also State v. Imperial Marketing,* 196 W.Va. 346, 472 S.E.2d 792

(1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 391, 136 L.Ed.2d 307 (1996).[14] Although Rule 7.3(a) is partially directed at the prevention of false and misleading communication, it reaches beyond that plain and simple goal by proscribing any in-person or telephone solicitation when the lawyer has no family or professional relationship with the recipient and his or her motive is pecuniary gain. Therefore, we must proceed to the remaining three-prong analysis required by *Central Hudson.*

The first question under *Central Hudson* is whether the government has asserted a substantial interest in support of this rule. The Rules of Professional Conduct were promulgated and adopted by this Court on June 30, 1988. Each rule is accompanied by a comment, which "explains and illustrates the meaning and purpose of the Rule." Scope, West Virginia Rules of Professional Conduct. The comment following Rule 7.3 expresses the interest behind the rule:

> There is a potential for abuse inherent in direct in-person or telephone contact by a lawyer with a prospective client known to need legal services. These forms of contact between a lawyer and a prospective client subject the layperson to the private importuning of the trained advocate in a direct, interpersonal encounter. The prospective client, who may already feel overwhelmed by the circumstances giving rise to the need for legal services, may find it difficult fully to evaluate all available alternatives with reasoned judgment and appropriate self-interest in the face of the lawyer's presence and insistence upon being retained immediately. The situation is fraught with the possibility of undue influence, intimidation, and over-reaching. . . .

---

**13.** Respondents first raised this issue in their brief before this Court. It was not raised before the Lawyer Disciplinary Board, nor in their objection to the recommended disposition.

**14.** In *State v. Imperial Marketing,* we characterized this *Central Hudson* test as involving four steps, the first being an analysis of whether the speech concerned lawful activity and was or was not misleading, with the remaining steps being the three prongs enumerated in the quote above. We reaffirm and utilize here the four-step test

established in *Imperial Marketing.* In our discussion above, we determine that the first step in *Imperial Marketing* is not dispositive of the questions before us and proceed to the remaining three prongs of the test, as set out in *Central Hudson.* We also note and refer the reader to footnote 48 of *Imperial Marketing,* where we discussed the recent developments with respect to the fourth step in our *Imperial Marketing* analysis.

The United States Supreme Court recognized, in a case involving in-person solicitation by a lawyer, that " '[t]he interest of the States in regulating lawyers is especially great since lawyers are essential to the primary governmental function of administering justice, and have historically been "officers of the courts." ' " *Ohralik v. Ohio State Bar Ass'n.*, 436 U.S. 447, 460, 98 S.Ct. 1912, 1920, 56 L.Ed.2d 444, 456 (1978) (citation omitted). Moreover, the Court stated "[w]e agree that protection of the public from these aspects of solicitation [fraud, undue influence, intimidation, overreaching, and other forms of 'vexatious conduct'] is a legitimate and important state interest." *Id.* at 462, 98 S.Ct. at 1921, 56 L.Ed.2d at 457. While *Ohralik* dealt with solicitation by a lawyer, the Court recognized that "solicitation by a lawyer's agents or runners would present similar problems." *Id.* at 464 n. 22, 98 S.Ct. at 1923 n. 22, 56 L.Ed.2d at 459 n. 22. *Ohralik* also involved in-person solicitation. However, we believe the government has a similar substantial interest in regulating telephone solicitation.

As noted, respondents characterize telephone solicitation as similar to solicitation through direct mail. Respondents assert that telephone calls are more like targeted mail, because there is not the personal presence of a trained advocate badgering the potential client. We disagree. Both in-person and telephone solicitation involve unrecorded personal contact. Letters, on the other hand, provide a record of the communication. The United States District Court for the Eastern District of Texas dealt with this issue and upheld as constitutional a rule prohibiting lawyers from engaging in telephone solicitation in *Texans Against Censorship v. State Bar of Texas*, 888 F.Supp. 1328 (E.D.Tex.1995), *aff'd*, No. 95-40376, 100 F.3d 953 (5th Cir. Oct.9, 1996). That court observed that "[m]isleading or coercive telephone solicitations apparently would be at least as difficult to prove as fraudulent face-to-face solicitations. In fact, they may be more difficult, since the consumer will only be able to identify the caller by his or her voice." *Id.* at 1354. Our view is reinforced by evidence obtained by respondents during their cross-examination of witnesses at the hearing on the statement of charges. Re-

spondents emphasized that the witnesses had no actual knowledge of the identity of the person who contacted them by telephone. Thus, we conclude that, as the body charged with regulating and controlling the practice of law in West Virginia, this Court has a substantial interest in regulating telephone solicitation by lawyers.

We must next determine whether the government has demonstrated that the restriction on commercial speech directly and materially advances this substantial interest. The United States Supreme Court has explained that this burden " 'is not satisfied by mere speculation and conjecture; rather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree.' " *Florida Bar v. Went for It, Inc.*, 515 U.S. at ——, 115 S.Ct. at 2377, 132 L.Ed.2d at 550 (citations omitted). The Supreme Court indicated that such demonstration may be made through anecdotal evidence. *Id.* In reviewing the transcripts of this case, we believe that we have found sufficient evidence to meet this prong of the test.

Michael Shepard, whose father was killed in an automobile accident, testified that he received a telephone call from a representative of Coale, Allen & Van Susteren "the night after his accident and I was numb. I really didn't have an opinion at that time about the phone call. I was just more concerned about what had happened." Scarlett Mayle received her first telephone solicitation from Coale, Allen & Van Susteren approximately three days after her husband had been severely burned in an industrial accident. She stated that she "felt kind of offended because I felt that he sort of thought I was a dumb, little housewife and that I would sign the papers while Ed was, you know, out of it. And I'm glad I just talked to my father in law and he said just wait till Ed's ready and if he wants to do something, fine. I'm glad I had someone to back me up because I, you know, I wouldn't have." Lenier Baird was contacted shortly after her husband was killed in a mining accident. She expressed in her testimony

that she "felt that a law firm—well, at that time I really didn't have a complete understanding of what happened. I thought it was just an accident. They made me aware that there was a little bit more to it. So I felt that they were being greedy, I guess. It was just a little bit too soon to be contacted." Charles Tamaska was represented by Coale, Allen & Van Susteren in a case involving an airplane accident in which his son was killed. Mr. Tamaska testified that he was contacted approximately six weeks after his son died. He stated, "I wasn't going to do nothing about the accident, sue or nothing about the accident. But he had talked to me and said I had my rights to getting, I believe it was insurance money or getting stuff like that from this accident.... He more or less talked me into it, in a way." Finally, Linda Moran, who was contacted within twenty-four hours of her husband's death, testified that she "was very upset about [receiving the call]. That didn't help the situation any." Mrs. Moran also stated that she received five or six calls from representatives of Coale, Allen & Van Susteren.

After reviewing this evidence, we find that it is sufficient to establish that the harms addressed by Rule 7.3 are real and that proscribing telephone solicitation does in fact alleviate such concerns to a material degree.[15]

Finally, we must determine whether there is a reasonable fit between Rule 7.3 and the State's interest in regulating telephone solicitation by lawyers. We believe that there is. Turning again to the comment following Rule 7.3, we note that the Court observed:

This potential for abuse inherent in direct in-person or telephone solicitation of prospective clients justifies its prohibition, particularly since lawyer advertising and written and recorded communication permitted under Rule 7.2 offer alternative means of conveying necessary information to those who may be in need of legal services. Advertising and written and recorded communications make it possible for a prospective client to be informed about the need for legal services, and about the qualifications of available lawyers and law firms, without subjecting the prospective client to direct in-person or telephone persuasion that may overwhelm the client's judgment.

The use of general advertising and written and recorded communications to transmit information from lawyer to prospective client, rather than direct in-person or telephone contact, will help to assure that the information flows cleanly as well as freely. The contents of advertisements and communications permitted under Rule 7.2 are permanently recorded so that they cannot be disputed and may be shared with others who know the lawyer. This potential for informal review is itself likely to help guard against statements and claims that might constitute false and misleading communications, in violation of Rule 7.1. The contents of direct, in-person or telephone conversations between a lawyer to a prospective client can be disputed and are not subject to third-party scrutiny. Consequently, they are much more likely to approach (and occasionally cross) the dividing line between accurate representations and those that are false and misleading....

In addition, we note that the district court in *Texans Against Censorship* observed that "[t]he unique difficulties inherent in monitoring telephone solicitations from lawyers, however, provides the strongest justification for imposing a ban on such communications.... It appears that any attempt to compel law-

---

**15.** The District Court in *Texans Against Censorship v. State Bar of Texas*, 888 F.Supp. 1328 (E.D.Tex.1995), *aff'd*, No. 95–40376, 100 F.3d 953 (5th Cir. Oct.9, 1996), recognized that:

[S]imply because lawyers have not telemarketed their services in the past, this circumstance does not mean defendants' concern about such activity is purely conjectural.... Moreover, while there is scant evidence that Texas lawyers have engaged in fraudulent telemarketing, there is substantial evidence that Texas lawyers

have engaged in misleading or fraudulent direct mail solicitation.... Lawyers inclined to put misleading statements in a letter seemingly would be just as likely to communicate misleading messages over the telephone. It is found, therefore, that defendants are justified in their assertion that the ban on telephonic solicitation by lawyers in amended rule 7.03(a) directly advances the interest in protecting the public from overreaching by lawyers.
*Id.* at 1352–53.

yers to record or otherwise preserve telephone conversations with prospective clients would raise serious privacy concerns, as well as concerns regarding the attorney-client privilege." 888 F.Supp. at 1353–54.

■ For the above stated reasons, we conclude that commercial speech that is not unlawful or misleading may be regulated only if the government satisfies the remaining steps of the test set forth in *Central Hudson Gas v. Public Service Com'n of New York*, 447 U.S. 557, 564–65, 100 S.Ct. 2343, 2350–51, 65 L.Ed.2d 341, 350–51 (1980), which requires first, that the government assert a substantial interest in support of its regulation; second, that the government demonstrate that the restriction on commercial speech directly and materially advances that interest; and third, that there is a reasonable fit between the regulation and the State's interest. As the body charged with regulating and controlling the practice of law in West Virginia, the West Virginia Supreme Court of Appeals has a substantial interest in regulating telephone solicitation by lawyers. Moreover, Rule 7.3(a) of the West Virginia Rules of Professional Conduct, which proscribes telephone solicitation by lawyers, directly advances West Virginia's stated interest for such restriction and there is a reasonable fit between the regulation and the State's interest in such regulation. Finally, we hold that direct telephone solicitation of a prospective client with whom the lawyer has no family or prior professional relationship, when at least partially motivated by the potential for the lawyer's pecuniary gain, violates Rule 7.3(a) of the West Virginia Rules of Professional Conduct and is not protected as the constitutional exercise of commercial speech.

As we indicated earlier in this opinion, we condemn, in the strongest terms, the conduct engaged in by respondents, who, through non-lawyer representatives, repetitively contacted potential clients in a manner that ordinarily would not be subject to suitable, regular scrutiny. Where, as here, contacts are made at the height of grief after a loved one has been severely injured or killed, a likely result of such conduct is that advantage will be taken of the special vulnerability attendant upon a loved one's injury or death. Even in less strained or distressed circumstances, the practical reality that such telephone contacts cannot be suitably monitored or reviewed fully justifies the scope of the rule and its enforcement, in the public interest. Finally, it is self-evident that respondents' interest was, and the interest of any other lawyers who might engage in such telephone solicitation is most often likely to be, the acquisition of clients, to the lawyers' financial gain. We conclude that such is the very conduct our rule is meant to prevent, in the public interest.

RESPONDENTS' ACCOUNTABILITY

■ Respondents argue that there was insufficient evidence to prove that they individually violated any Rule of Professional Conduct, and, consequently, they also deny that they induced or caused those in their employ to conduct the telephone solicitations we have condemned. Respondents contend that in West Virginia the only basis for disciplining a lawyer for the activities of a law firm of which the lawyer is a member or employee is set forth in Rules 5.1(c) and 5.3(c). Respondents assert that there is no evidence that either Mr. Coale or Ms. Van Susteren ordered, ratified, or had prior knowledge of the solicitation activities with which they were charged.

Rules 5.1[16] and 5.3[17] impose particular duties upon a partner in a law firm to make

---

**16.** Rule 5.1 states:

(a) A partner in a law firm shall make reasonable efforts to ensure that the firm has in effect measures giving reasonable assurance that all lawyers in the firm conform to the Rules of Professional Conduct.

(b) A lawyer having direct supervisory authority over another lawyer shall make reasonable efforts to ensure that the other lawyer conforms to the Rules of Professional Conduct.

(c) A lawyer shall be responsible for another lawyer's violation of the Rules of Professional Conduct if:

(1) the lawyer orders or, with knowledge of the specific conduct, ratifies the conduct involved; or

(2) the lawyer is a partner in the law firm in which the other lawyer practices, or has direct supervisory authority over the other lawyer, and knows of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable remedial action.

**17.** Rule 5.3 states:

With respect to a nonlawyer employed or retained by or associated with a lawyer:

reasonable efforts to ensure that persons retained or employed by the firm conduct themselves in a way that is compatible with the Rules of Professional Conduct. The record contains a letter to one of the prospective clients, signed by respondent Coale and referring to one Tyrone Roberts, and thus implying that Mr. Roberts was an authorized individual for the firm. Another letter, signed by respondent Allen and addressed to disciplinary counsel, discloses the authority of Ted Dickenson to conduct investigations for the Coale, Allen & Van Susteren firm. Moreover, the letterhead of the firm was used by persons identified as making the telephone calls at issue here. The letters that were sent as a result of the calls were also accompanied by firm brochures, which pictured firm members and discussed the firm. In some instances the letters and brochures were accompanied by a narrative, which was on firm stationary, discussing the particular type of claim involved and the firm's ability to represent the client in such a claim. Finally, two airbills which were used in sending follow-up literature to the prospective clients and which contained the firm name and address were also admitted into evidence and tied to the solicitations.

The evidence supports the conclusion that the callers and those who mailed or otherwise sent information regarding the firm to prospective clients acted not only on behalf of the firm, but with the general authority and direction of the firm and its members. It is noted particularly that one of the prospective

clients contacted by these non-lawyers later hired the firm. It strains credulity to suggest that airbills, advertising material including pictures of the members of the firm, letters on the firm letterhead, telephone calls, and even the retaining of the firm to represent one of the persons called could all have materialized without the involvement and consent of respondents. Any other conclusion would suggest complete failure to supervise one's employees and agents sufficiently to assure compliance with the Rules of Professional Conduct, in violation of Rule 5.3 regarding non-lawyer employees. Finally, we note that the complaining respondents failed to appear and testify. We think the Board is entitled to the presumption that respondents' truthful testimony would have been adverse to them.[18] In any event, while the evidence is not as complete as we would prefer, we believe the Board's conclusions are supported on the whole record by reliable, probative, and substantial evidence.

Accordingly, we find that respondents Allen, Coale, and Van Susteren engaged in professional misconduct by inducing others to initiate the improper telephone solicitations which we found violative of Rules 7.3(a) and 7.3(b)(1) of the Rules of Professional Conduct. Further, we note that, while violations of Rule 5.3(a) requiring supervision of non-lawyers employed or retained by a law firm is not charged here, the conduct of respondents, including Mr. Allen, is highly suggestive of the conclusion that they failed completely to carry out the duties imposed

(a) a partner in a law firm shall make reasonable efforts to ensure that the firm has in effect measures giving reasonable assurance that the person's conduct is compatible with the professional obligations of the lawyer;

(b) a lawyer having direct supervisory authority over the nonlawyer shall make reasonable efforts to ensure that the person's conduct is compatible with the professional obligations of the lawyer; and

(c) a lawyer shall be responsible for conduct of such a person that would be a violation of the Rules of Professional Conduct if engaged in by a lawyer if:

(1) the lawyer orders or, with the knowledge of the specific conduct, ratifies the conduct involved; or

(2) the lawyer is a partner in the law firm in which the person is employed, or has direct supervisory authority over the person, and knows of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable remedial action.

**18.** See syllabus point 3, *McGlone v. Superior Trucking Company, Inc.*, 178 W.Va. 659, 363 S.E.2d 736 (1987) (The unjustified failure of a party in a civil case to call an available material witness may, if the trier of the facts so finds, give rise to an inference that the testimony of the 'missing' witness would, if he or she had been called, have been adverse to the party failing to call such witness....).

upon them by Rule 5.3(a) of the Rules of Professional Conduct to properly supervise the activities of those employed or retained by them and assure their compliance with respondents' professional responsibilities, especially in light of respondents' contention, which we reject, that they were not responsible for the actions of Tyrone Roberts and Ted Dickenson.

## PRESENTATION AS LEGAL SPECIALIST

We next address respondents' challenge to Rule 7.4 of the Rules of Professional Conduct.[19] Respondents were charged with violating Rule 7.4 because certain material sent to two of the individuals solicited referred to the firm as "trial specialists" or stated that the firm "specializes in cases like yours." Respondents argue that under *Peel v. Attorney Registration & Disciplinary Commission of Illinois*, 496 U.S. 91, 110 S.Ct. 2281, 110 L.Ed.2d 83 (1990), these publicized claims of specialization may not be the basis of disciplinary action because the description was not misleading.

■ First, we conclude that the Board's finding that respondents' actions violated Rule 7.4, as presently constituted, is supported by reliable, probative, and substantial evidence on the whole record. Respondents' statements, drawn from their advertising material, clearly state claims of specialization. We note that the record is totally devoid of any evidence that respondents have been qualified, in this State or in any state in which they may be licensed to practice, to claim any certification or recognition of their status as trial specialists by any independent or governmental accrediting body. In short, their claims appear to be no more than "com-mercial puffery" and self-praise. Nevertheless, we believe it is necessary to evaluate this rule under the *Central Hudson* standard to ascertain if discipline may be imposed on the basis of Rule 7.4 for conduct which violates the rule as presently constituted.

Rule 7.4, like Rule 7.3(a), is partially directed toward the prevention of false and misleading communications, and like 7.3(a), reaches beyond that plain and simple goal. Therefore, because it broadly proscribes any implication that a lawyer is a specialist, we proceed to the remaining three-prongs of *Central Hudson*.[20]

We need not linger on a discussion of whether the State has asserted a substantial interest in support of Rule 7.4. As we stated above, the United States Supreme Court has recognized that " '[t]he interest of the States in regulating lawyers is especially great since lawyers are essential to the primary governmental function of administering justice, and have historically been "officers of the courts." ' " *Ohralik v. Ohio State Bar Ass'n.*, 436 U.S. 447, 460, 98 S.Ct. 1912, 1920, 56 L.Ed.2d 444, 456 (1978) (citation omitted). We also find that Rule 7.4 addresses to some degree the legitimate state interest of protecting the public from aspects of solicitation which might involve fraud, undue influence, intimidation, overreaching, and other forms of vexations conduct. *See Ohralik, Id.* We perceive that Rule 7.4 addresses that legitimate state interest by prohibiting the publication of claims of speciality, except in the two instances provided, in the expectation that the public will be thereby protected from unfounded claims of expertise which might mislead or harm those seeking legal representation. We note that the two exceptions have been historically· recognized in codes of professional conduct or ethics,[21] pre-

---

19. Rule 7.4 states:
 A lawyer may communicate the fact that the lawyer does or does not practice in particular fields of law. A lawyer shall not state or imply that the lawyer is a specialist except as follows:
 (a) a lawyer admitted to engage in patent practice before the United States Patent and Trademark Office may use the designation "Patent Attorney" or a substantially similar designation;
 (b) a lawyer engaged in Admiralty practice may use the designation "Admiralty," "Proctor in Admiralty" or a substantially similar designation.

20. *See* footnote 14, *supra.*

21. According to the Code of Professional Responsibility, which was adopted in 1970 to replace the Code of Professional Ethics:
 In some instances a lawyer confines his practice to a particular field of law. In the absence of state controls to insure the existence of special competence, a lawyer should not be permitted to hold himself out as a specialist or as having special training or ability, other than in the historically excepted fields of admiralty, trademark, and patent law.

sumably because of the requirement of the patent office that practitioners before it be specially and separately admitted to practice before that office and, in the case of admiralty, because of the special knowledge that was widely recognized as required for that practice, knowledge with which many practicing lawyers, presumably, were not equipped. Thus, Rule 7.4 can be properly seen as addressing a legitimate state interest in discouraging claims of expertise where none was recognized and accommodating at least two fields where such expertise was widely recognized.

■ The next prong requires a determination of whether the government has demonstrated that the restriction on commercial speech directly and materially advances that interest. The comment following Rule 7.4 states an underlying rationale of the rule, that "[t]he term 'specialist' and like terms has acquired a secondary meaning implying formal recognition as a specialist. Hence, use of the term 'specialist' may be misleading unless the lawyer is certified or recognized in accordance with procedures in the state where the lawyer is licensed to practice." We believe it is evident that the term "specialist" implies some approval by an accrediting agency or governmental body, in accord with procedures approved where the lawyer is licensed to practice. As we noted above, Rule 7.4 prohibits the use of the term "specialist" except in two areas of the practice of law which were historically recognized as requiring some level of special knowledge and expertise, patent law and admiralty. However, in West Virginia we have not spoken to or developed means by which a lawyer may be "certified or recognized" as a "specialist" in any other areas of the law. Similarly, we have not developed means by which "specialist" lawyers who have received licenses in other states and who may legitimately engage in the practice of law here can communicate their status as specialists.

■ We take judicial notice of the practice of lawyers publishing "fields of concentration", in apparent conformity with the provisions of Rule 7.4 permitting a lawyer to

Code of Professional Responsibility EC 2–14

"communicate the fact that the lawyer does or does not practice in particular fields of law." We take notice that some law lists, which are tools for soliciting business within the law profession and related fields, have now encouraged lawyers to select such fields of "concentration" and publicize their selections. Furthermore, we note that some law firms recognize those fields of "concentration" within their partnership or corporate organizations. We perceive that naming a field of "concentration" differs, at least in degree, from claiming one is a "specialist". It appears that the choice of a field of "concentration" indicates only the practitioner's intention to devote his or her efforts to a field of law and, at least presumptively, does not carry with it the suggestion, in accord with the comment accompanying Rule 7.4, that the practitioner has been "certified or recognized in accordance with procedures in the state where the lawyer is licensed to practice" as a *specialist.* However, we are not persuaded, in the absence of procedures for acknowledging a specialty for which a lawyer may be "certified or recognized" in the state where he or she is licensed to practice, that Rule 7.4 of the West Virginia Rules of Professional Conduct directly and materially advances the legitimate state interest to which it is directed.

We conclude that attention must be promptly given to revising Rule 7.4 and developing the procedures it envisions for recognition of duly accredited or recognized specialization. Pending full discussion of the issues, it would appear that, in the public interest, the distinction between a concentration and a speciality must be defined, if it is to be retained, and procedures must be developed to certify or recognize "specialists", all in a manner that directly and materially advances the state interest or interests to which Rule 7.4 is directed. We do not mean to limit the discussion appropriate to a revision of Rule 7.4 to the issues mentioned, but only to state some initial considerations we deem appropriate. In sum, we suggest that a revised Rule 7.4 should be supported by evidence that demonstrates that the government's concerns " 'are real and that its re-

(1973) (footnotes omitted).

striction will in fact alleviate them to a material degree.'" *Florida Bar v. Went for It, Inc.,* 515 U.S. at ——, 115 S.Ct. at 2377, 132 L.Ed.2d at 550 (citations omitted).

Finally, it must be determined whether there is a reasonable fit between rule 7.4 and the State's interest in preventing lawyers from claiming a specialty. We believe that Rule 7.4 fails on this point as well. In light of our discussion regarding the second prong of the *Central Hudson* test, we need not discuss this third prong of the test in detail. In *Peel v. Attorney Registration & Disciplinary Commission of Illinois,* the United States Supreme Court addressed whether a lawyer has a constitutional right, under the standards applicable to commercial speech, to advertise his or her certification as a trial specialist by the National Board of Trial Advocacy (NBTA). The Court recognized that:

> A lawyer's certification by NBTA is a verifiable fact, as are the predicate requirements for that certification. Measures of trial experience and hours of continuing education, like information about what schools the lawyer attended or his or her bar activities, are facts about a lawyer's training and practice. A claim of certification is not an unverifiable opinion of the ultimate quality of a lawyer's work or a promise of success, cf. *In re R.M.J.,* 455 U.S. [191], at 201, n. 14, 102 S.Ct. [929], at 936, n. 14 [71 L.Ed.2d 64 (1982)] , but is simply a fact, albeit one with multiple predicates, from which a consumer may or may not draw an inference of the likely quality of an attorney's work in a given area of practice.

*Peel,* 496 U.S. at 101, 110 S.Ct. at 2288, 110 L.Ed.2d at 95 (footnote omitted). The court concluded that Illinois Code of Professional Responsibility Rule 2–105(a)(3), which stated in part that "no lawyer may hold himself out as 'certified' or a 'specialist'" was "'"broader than reasonably necessary to prevent the"

perceived evil.'" *Id.* at 107, 110 S.Ct. at 2291, 110 L.Ed.2d at 99. Similarly, we find that Rule 7.4 is broader than reasonably necessary. Attention should be given to this prong of *Central Hudson* as Rule 7.4 is re-evaluated.

Consequently, we hold that Rule 7.4 of the West Virginia Rules of Professional Conduct, as adopted by this Court on June 30, 1988, does not survive the test for determining whether a regulation of commercial speech is constitutional, as set forth in *Central Hudson Gas v. Public Service Com'n of New York,* 447 U.S. 557, 564–65, 100 S.Ct. 2343, 2350–51, 65 L.Ed.2d 341, 350–51 (1980). While we recognize a legitimate state interest in discouraging claims of expertise where none is recognized, Rule 7.4 fails to directly and materially advance this interest and is broader than reasonably necessary to prevent unrecognized claims of expertise.

We stress that our decision regarding Rule 7.4 does not suggest that members of the Bar can or should express an expertise not grounded in fact or that they should advance their own interests by degrading the skill of others. Pending a full discussion and re-evaluation of Rule 7.4, we believe that members of the Bar must refrain from any conduct which would be contrary to the public interest the rule is intended to address and carefully observe the remaining Rules of Professional Conduct which may bear on conduct that has previously fallen within the purview of Rule 7.4 as well.

## THE ISSUE OF SANCTIONS

Respondents argue that the Lawyer Disciplinary Board (formerly the Committee on Legal Ethics of the West Virginia State Bar) did not have jurisdiction to impose disciplinary sanctions upon them because they are not members of the West Virginia State Bar and because they were not regularly engaged in the practice of law in West Virginia.[22]

---

**22.** In support of their argument respondents cite cases from other jurisdictions. We have reviewed these cases and find them to be unpersuasive to the issue at hand. In the first case cited by respondents, the Court of Appeals of Maryland determined that it did not have jurisdiction under its disciplinary rules over a member of the

Ohio bar who had never been admitted to practice in Maryland. *Atty. Grievance Commission of Md. v. Hyatt,* 302 Md. 683, 490 A.2d 1224 (1985). However, the jurisdictional rule applied in that case is more narrow than the one we are asked to interpret. Respondents next cite *Matter of Fletcher,* 655 N.E.2d 58 (Ind.1995), wherein the

Article VI, § 4 of the West Virginia State Bar Constitution and By–Laws [23] was in effect at the time of respondents' conduct that was violative of the Rules of Professional Conduct and is, therefore, the proper jurisdictional rule to apply to this case. *Cf. Committee on Legal Ethics of West Virginia State Bar v. Printz*, 187 W.Va. 182, 184, 416 S.E.2d 720, 722 (1992) (Found the Code of Professional Responsibility was applicable to alleged unethical conduct that occurred in 1987, even though the Code had been replaced with the Rules of Professional Conduct in 1989.) Under Article VI, § 4 of the By–Laws, the Lawyer Disciplinary Board had jurisdiction over "any individual admitted to practice as an attorney in any other jurisdiction who regularly engages in the practice of law in West Virginia." Therefore, to determine whether respondents were subject to disciplinary sanctions within this State, we must determine whether they were regularly engaged in the practice of law in West Virginia.[24]

### Practice of Law

What constitutes the practice of law in West Virginia has been defined by order of this Court. In *State ex rel. Frieson v. Isner*, 168 W.Va. 758, 285 S.E.2d 641 (1981), this Court discussed our definition of the practice of law and compared it to that espoused in decisions of other state courts. We observed that:

These decisions stress that the practice of law is not limited to the conduct of cases before courts, but also includes services rendered outside court such as "the preparation of pleadings and other papers incident to actions and special proceedings and the management of such actions and proceedings on behalf of clients before judges and courts, and in addition conveyancing, the preparation of legal instruments of all kinds, and in general all advice to clients and all action taken for them in matters connected with the law."

*Id.* at 768, 285 S.E.2d at 650 (citations omitted).[25]

---

Supreme Court of Indiana issued a per curiam opinion finding that it had jurisdiction over a member of the Illinois bar who was admitted *pro hac vice* in an Indiana court. There was no such admission in the case before us. Finally, respondents cite *Kentucky Bar Association v. Shane*, 553 S.W.2d 467 (Ky.1977). *Shane* involved a member of the Ohio bar who was entered as co-counsel in a pending civil action when he violated Kentucky's disciplinary rules. The Supreme Court of Kentucky asserted jurisdiction over Shane because he was practicing law in Kentucky. Shane apparently did not challenge such jurisdiction, and the court's decision does not discuss the requirements for falling within its disciplinary jurisdiction. Rather, Shane argued that his disciplinary penalty should be no more severe than that which had already been imposed by the Ohio bar association to which he was admitted. The Kentucky court held that it was not bound by the disciplinary penalties imposed in a foreign jurisdiction for the same conduct.

**23.** The relevant portion of Article VI, § 4 of the By–Laws of the West Virginia State Bar states:
 There shall be included within the jurisdiction of the committee on legal ethics of the West Virginia State Bar all attorneys specifically admitted to practice by a court of West Virginia or *any individual admitted to practice as an attorney in any other jurisdiction who regularly engages in the practice of law in West Virginia.* (Emphasis added).

**24.** Complainant argues that this Court has jurisdiction over attorneys who practice law in West

Virginia without being admitted to practice as a member of the State Bar or on a *pro hac vice* basis based upon inherent, constitutional, and statutory authority. We have repeatedly held that " '[t]he constitutional authority to define, regulate and control the practice of law in West Virginia is vested in the Supreme Court of Appeals.' *State ex rel. Askin v. Dostert*, [170] W.Va. [562], 295 S.E.2d 271 (1982)." Syl. pt. 1, *Carey v. Dostert*, 170 W.Va. 334, 294 S.E.2d 137 (1982). *See also Committee on Legal Ethics v. Karl*, 192 W.Va. 23, 449 S.E.2d 277 (1994); *Bias v. Workers' Comp. Comm'r*, 181 W.Va. 188, 381 S.E.2d 743 (1989); *Lane v. West Virginia State Bd. of Law Exmrs.*, 170 W.Va. 583, 295 S.E.2d 670 (1982); *State ex rel. Partain v. Oakley*, 159 W.Va. 805, 815, 227 S.E.2d 314, 320 (1976); *Committee on Legal Ethics of W.Va. State Bar v. Graziani*, 157 W.Va. 167, 200 S.E.2d 353 (1973), cert. denied, 416 U.S. 995, 94 S.Ct. 2410, 40 L.Ed.2d 774 (1974); *W.Va. State Bar v. Earley*, 144 W.Va. 504, 109 S.E.2d 420 (1959); West Virginia Constitution, Article 8, § 1 *et seq.*; and, W.Va.Code § 51–1–4a. However, with regard to disciplinary actions against lawyers, this power is exercised through this Court's promulgation of the Rules of Professional Conduct and the Rules of Lawyer Disciplinary Procedure.

**25.** The definition of the practice of law may be found in Court Rules, *Michies West Virginia Code Annotated* 535 (1996). In part, the definition states:
 [A] person, natural or artificial, who undertakes the duties and responsibilities of an attor-

In the case *sub judice*, West Virginia residents were contacted by persons employed or retained by respondents for the purpose of gaining clients for the firm. The contacts were followed by personal letters encouraging the recipient to consider hiring respondents' firm. At least one of the letters advised the recipient of certain legal rights she may have had.[26] Moreover, two of these contacts resulted in representation of individuals by respondents' firm.[27] Each of the contacts had as its central purpose advising and encouraging the individuals to retain a lawyer to assist those individuals in vindicating their rights under the law. After reviewing the West Virginia definition of the practice of law in comparison to respondents' activities, we are persuaded that the activities engaged in on behalf of respondents clearly constituted the practice of law as defined by this Court.

We recognize that these phone contacts were most likely initiated outside of West Virginia. However, we find that the solicitation of a client, who is at the time of the solicitation located in West Virginia, with respect to a prospective legal action cognizable by the courts of this State constitutes the practice of law in West Virginia. We believe this view is supported by our previous holding in syllabus point 3 of *State v. Knapp*, 147 W.Va. 704, 131 S.E.2d 81 (1963), which states that "[w]hen a contract results from an offer made in one state and an acceptance in another state, the contract generally will be deemed to have been made in the state in which the acceptance occurs." The *Knapp* Court found that West Virginia could exercise its jurisdiction over a foreign corporation in a cause of action that arose out of an oral modification to a contract, which modification was made by telephone. Other jurisdictions have recognized the same rule. *Rothenberg v. H. Rothstein & Sons*, 181 F.2d 345 (3rd Cir.1950) (Court found that contract was made in Pennsylvania where defendant in Philadelphia accepted by telephone the offer of Plaintiff, who was in Buffalo, New York, to sell a specific carload of fresh peas); *United States v. Bushwick Mills*, 165 F.2d 198, 202 (2nd Cir.1947) (Court commented that "[a]n offer to sell made by telephone from ... Brooklyn to an offeree in New York may be prosecuted in either district.... By the technical law of contracts the contract is made in the district where the acceptance is spoken."). Similarly, in the case *sub judice*, representatives of the Coale, Allen & Van Susteren law firm contacted potential clients in West Virginia for the purpose of convincing such individuals to enter into a contract of representation with the firm. The initial contacts were followed in most cases with more telephone contacts and mailed material. The clear object of the contacts was to solicit the acceptance of offers to provide professional representation, primarily in cases to be heard in West Virginia. Those offers were open to acceptance by the prospective clients located in West Virginia. Moreover, two of the solicitations resulted in such acceptance

---

ney-at-law is nonetheless practicing law though such person may employ or select others to whom may be committed the actual performance of such duties.

\* \* \* \* \* \*

In general, one is deemed to be practicing law whenever he or it furnishes to another advice or service under circumstances which imply the possession or use of legal knowledge and skill.

More specifically but without purporting to formulate a precise and completely comprehensive definition of the practice of law or to prescribe limits to the scope of that activity, one is deemed to be practicing law whenever (1) one undertakes, with or without compensation and whether or not in connection with another activity, to advise another in any mat-

ter involving the application of legal principles to facts, purposes or desires; ... or (3) one undertakes, with or without compensation and whether or not in connection with another activity, to represent the interest of another before any judicial tribunal or officer....

26. A November 10, 1992 letter to Ms. Scarlett Mayle advised her that her husband Ed "[i]n all probability" would be "eligible for workman's compensation, since the accident occurred when he was on the job." The letter also stated that Ms. Mayle's husband "may be eligible for personal injury compensation. If Pyro Power is responsible for the faulty seal, then their insurance company may be held liable for Ed's injuries."

27. Respondents' firm was hired by Mr. Charles Tamasca and Mrs. Donald Glaspell.

and contracts of representation.[28] Hence, we believe that the conduct under scrutiny occurred, at least in part, in this State and that this Court would be justified in enforcing our disciplinary rules with respect to that conduct.

### "Regularly Engaged"

To support its argument that respondents were regularly engaged in the practice of law, the Board relies on *Committee on Legal Ethics v. McGaughey*, No. 21842 (W.Va. December 13, 1993) (unpublished per curiam order). This is the only case that we have found that interprets the "regularly engaged in the practice of law" language formerly included in Article VI, § 4 of the West Virginia State Bar By–Laws. The *McGaughey* Court observed that:

> While Mr. McGaughey does not have an office in West Virginia, he has been admitted on a pro hac vice basis to practice in various West Virginia courts. The Committee contends that jurisdiction is appropriate over Mr. McGaughey based upon a pattern of practice in West Virginia and Mr. McGaughey's own recognition that approximately seven percent of his practice during the relevant period consisted of legal matters in this state. Mr. McGaughey has filed numerous pleadings and has represented clients in the circuit courts of Roane, Wood, Ritchie, and Kanawha Counties and in the United States District Court for the Southern District of West Virginia.

*Id.* at 2. The Court then concluded that West Virginia had jurisdiction "by virtue of the fact that Mr. McGaughey engaged in *significant practice of law in this state*, thereby satisfing [sic] the language requiring him to have regularly engaged in practice in this state." *Id.* at 4–5, (emphasis added).

We also observe that *Webster's Third New International Dictionary of the English Language Unabridged* 1913 (1970), defines "regularly" as a "regular, orderly, lawful, or methodical way." "Regular" is defined as "steady or uniform in course, practice, or occurrence, not subject to unexplained or irrational variation: steadily pursued; orderly, methodical." *Id.*

■ Representatives of Coale, Allen & Van Susteren solicited individuals in West Virginia for legal representation with respect to six separate possible civil actions from November, 1990 to February, 1993: once in 1990; three times in March, 1992; once in November, 1992; and once in February, 1993. The 1990 solicitation of Mr. Charles Tamasca and the March, 1992 solicitation of Mr. David Glaspell resulted in the firm Coale, Allen & Van Susteren being hired. In the matter of Tamasca, a civil action was filed in 1992 and voluntarily dismissed in 1993. In Glaspell, a civil action was filed in Pennsylvania in 1992, but was voluntarily dismissed and re-filed in West Virginia in 1993. Shortly after the re-filing, the case was settled and dismissed. Respondents were also involved in two cases here that were not connected to the charges against them. The firm represented several parties in a case that was filed in 1991 in the United States District Court for the Southern District of West Virginia. The case was settled with regard to one of their clients, and their relationship with the remaining clients was terminated by mutual consent. Finally, in the early 1990's Ms. Van Susteren represented a criminal defendant before the United States District Court for the Northern District of West Virginia.

■ Thus, it appears that from 1990 through 1993, agents of Coale, Allen & Van Susteren established a reasonably steady course of contact with prospective clients in types of cases in which the firm had an interest. When considering this contact in connection with West Virginia cases in which

---

**28.** We note that in the related field of credit transactions, the Consumer Credit and Protection Act does not require that a solicitor be in West Virginia at the time of a solicitation:

> (1) This chapter applies if a consumer, who is a resident of this state, is induced to enter into a consumer credit sale made pursuant to a revolving charge account, to enter into a revolving charge account, to enter into a consumer loan made pursuant to a revolving loan account, or to enter into a consumer lease, *by personal or mail solicitation, and the goods, services or proceeds are delivered to the consumer in this state, and payment on such account is to be made from this state.*
>
> W.Va.Code § 46A–1–104(1) (emphasis added).

Coale, Allen & Van Susteren were involved, the question of whether they were regularly engaged in the practice of law is a close one. However, giving due respect to the burden of proof carried by the Board in proceedings of this nature, we simply cannot conclude that the conduct reflected by the record rises to a level sufficient to constitute the regular practice of law in this State. Consequently, because this Court, at the time of the complained of conduct, had made subject to professional discipline only those persons who "regularly engaged in the practice of law" in West Virginia, we decline to impose any professional discipline on Mr. Coale, Mr. Allen, or Ms. Van Susteren for their conduct. We also decline to exercise, in these circumstances, the inherent power of this Court to regulate the practice of law in order to impose such sanctions. Finally, we hold that this Court retains the inherent power to regulate the practice of law in this State, and under Rule 1 of the Rules of Lawyer Disciplinary Procedure, as amended by this Court on December 6, 1994, a lawyer is subject to discipline in this State for violating the West Virginia Rules of Professional Conduct if he or she engages in the practice of law in this State, whether or not he or she is formally admitted to practice by this Court. Thus, under the current jurisdiction of the Lawyer Disciplinary Board, the conduct in which respondents engaged is clearly subject to our disciplinary procedures.[29]

## DUE PROCESS

Respondents complain that the Hearing Panel erred in denying their motion to dis-

miss for failure to afford them due process of the law. Respondents complain of several due process violations based upon the Board's failure to comply with required time limitations.[30] We take particular note of respondents' complaint that the Investigative Panel's "Finding of Cause to Proceed to Hearing" was rendered only as to Phillip Allen, and thus the Panel's failure to make a probable cause finding with respect to respondents Coale and Van Susteren, as required by Rule 2.9 of the Rules of Lawyer Disciplinary Procedure, renders the proceedings against them invalid and mandates dismissal of the proceedings. Respondents complain further that the Board sought and obtained an amendment of the Rules of Disciplinary Procedure for the express purpose of proceeding against respondents; that the Panel held hearings and ruled on dispositive motions in the absence of the quorum required by Rule 3.2 of the Rules of Lawyer Disciplinary Procedure and over the objections of respondents; that the Hearing Panel called disciplinary counsel as a witness in her own case in chief without a showing that the circumstances necessitated such action; that the Hearing Panel did not apply the West Virginia Rules of Evidence at the hearing on the statement of charges;[31] and that during the investigative stage of the complaint, a representative of the lawyer disciplinary counsel apparently harassed and intimidated Deborah Glaspell, a client of Coale, Allen & Van Susteren.[32] Respondents argue that the cumulative effect of the above listed irregularities has been to deny them due process.

29. Rule 1 of the Rules of Lawyer Disciplinary Procedure as presently stated requires only that a lawyer *"engage* in the practice of law in West Virginia". (Emphasis added.)

30. Respondents contend that the Board purposely delayed for eight months before bringing formal charges, while waiting for an amendment regarding jurisdiction under Rule 1 of the Rules of Lawyer Disciplinary Procedure to become effective; that the hearing on the charges against respondents was not noticed within 30 days of the issuance of formal charges as required by Rule 3.5; that the hearing on the charges against respondents was not held within 120 days of the issuance of formal charges as required by Rule 3.4; that even if the 120 day period was tolled by respondents' motion to dismiss, the hearing was well outside the 120 day period; that the Board

did not complete discovery within 90 days of the issuance of the statement of charges as required by Rule 3.5, and even if discovery was tolled by the filing of respondents' motion to dismiss, disciplinary counsel's discovery request was still outside the 90 day discovery period; that the Clerk of the Supreme Court of Appeals failed to serve the notice of the hearing within 30 days of the issuance of formal charges as required by Rule 3.5; and that the Board permitted disciplinary counsel to present her motion to compel over respondents' objection that the motion was untimely and the forum was inappropriate.

31. Respondents' evidentiary complaint is addressed below.

32. We find that this complaint is without merit.

We have carefully reviewed the record before us and have determined that respondents were not prejudiced by these irregularities. However, while we find that the disregard of the time limitations was not prejudicial in this instance, we encourage the Board to comply with such limitations in the future or to extend such limitations by a formal order, presumably after a motion, as required in Rule 3.4 of the Rules of Lawyer Disciplinary Procedure, which states, in relevant part:

The Chairperson of a Hearing Panel Subcommittee may extend or shorten periods contained in this rule for good cause shown. Any motion for continuance shall be filed with the Clerk of the Supreme Court of Appeals and the Chairperson of the Hearing Panel Subcommittee no later than fourteen days, other than in the case of emergency, prior to the date of the hearing.

■ We similarly find that the omission of Mr. Coale and Ms. Van Susteren's names from the "Finding of Cause to Proceed to Hearing" was harmless error. The "Finding of Cause to Proceed to Hearing" was made on April 30, 1994, prior to the adoption of the Rules of Lawyer Disciplinary Procedure on July 1, 1994.[33] Under Article VI, § 12(b)[34] of the State Bar By–Laws, the Investigative Panel was required only to recommend to the Hearing Panel that a formal hearing be held. The Investigative Panel was then required to forward to the Hearing Panel a written statement of charges. Upon receiving the statement of charges, the Hearing Panel was to serve the accused attorney with the statement, along with a notice of the time and place of the hearing, pursuant to Article VI, § 14(a).[35]

Thus, it does not appear that the By-laws required that the decision of the Investigative Panel be formally filed as is now required by Rule 2.9(a) of the Rules of Lawyer Disciplinary Procedure, which states: "Within sixty days after the date of a report by the Office of Disciplinary Counsel, the Investigative Panel shall file a written decision regarding whether it believes there is probable cause to formally charge the lawyer with a violation of the Rules of Professional Conduct...."

In addition, the affidavit of Stephen G. Jory, Chairperson of the Lawyer Disciplinary Board (and its predecessor Committee on Legal Ethics) during the time in question, indicated that although Phillip B. Allen was listed as the respondent attorney after receipt of the original complaint, the subsequent investigation focused on the entire law firm of Coale, Allen & Van Susteren. The affidavit states further that the Investigative Panel voted to find probable cause to hold a hearing with respect to Mr. Coale, Mr. Allen, and Ms. Van Susteren. However, due to a clerical error, only Mr. Allen's name appeared on the form used by the Investigative Panel to indicate its probable cause finding. Finally, we note that the statement of charges properly reflected that the Investigative Panel found probable cause as to all three respondents, and all three respondents were notified of the charges against them by letter dated June 21, 1994. Because the Investigative Panel properly issued a statement of charges against all three respon-

---

**33.** The investigation and the Investigative Panel's finding of probable cause occurred while Article VI of the State Bar By–Laws was in effect. The statement of charges was issued after the Rules of Lawyer Disciplinary Procedure became effective.

**34.** Article VI, § 12(b) states, in relevant part:

When the investigation is completed the panel shall ... (2) upon a finding that probable cause exists to hold a hearing, recommend to the Hearing Panel that a formal hearing be held....

With respect to those matters in which the Investigative Panel has found that probable cause exists to hold a hearing, the panel shall cause to be issued a written statement of charges which contains a plain statement of charges against the accused attorney. The chairman of the Investigative Panel shall sign the statement of charges which shall then be forwarded to the Hearing Panel.

**35.** Article VI, § 14(a) states, in part:

Upon receipt of the Statement of Charges from the Investigative Panel, the Hearing Panel shall cause to be issued a written notice of the time and place of the hearing and attach it to the Statement of Charges. This Notice and Statement of Charges shall be served and executed on the accused attorney in accordance with the provisions of section thirty-nine of this article.

dents, and such respondents received timely notice of the charges against them, we find that the omission of two names from the "Finding of Cause to Proceed to Hearing" form was harmless error.

With regard to respondents' complaint that the Board sought and obtained an amendment [36] to the Rules of Lawyer Disciplinary Procedure for the express purpose of proceeding against them, we note that the Board's opinion that it had jurisdiction over respondents made no mention of the amended rule, but was based upon the inherent power of this Court to define, supervise, regulate, and control the practice of law within West Virginia. Since we have declined to exercise that inherent power to discipline respondents and have given them the benefit of the State Bar rules as they existed at the time of their misconduct, we need not further address this issue.

■ With respect to the issue regarding the absence of a quorum, we note that the Hearing Panel has adopted a practice of reviewing and ratifying actions recommended by less than the required quorum. We recognize that participation on such a panel is voluntary public service, which often creates a heavy burden on the membership. While we would entertain a revision of the rules to address the apparent technical deficiency created by the practice of subsequent ratification of Panel actions, we cannot find that the present practice prejudiced respondents in this matter. We note that we recently endorsed such a practice with respect to an executive department agency.[37] In any event, it may be appropriate to conform the practice to the rule or rule to the practice, with appropriate safeguards in the latter case.

■ With respect to disciplinary counsel being a witness, we believe that Rule 3.7(a) [38] of the Rules of Professional Conduct was not violated in these particular and limited circumstances because counsel's testimony was permissible on the grounds of hardship. However, to avoid even the appearance of impropriety, we believe that counsel should in the future anticipate and prepare for the eventualities which led to her being a witness.

We would prefer that future cases proposing professional discipline not have in the record the close procedural questions with which we have had to deal in this opinion. In resolving the issues thus presented, we have been mindful of Rule 61 [39] of the Rules of

---

**36.** Effective July 1, 1994, this Court adopted the Rules of Lawyer Disciplinary Procedure, which superseded Article VI of the By–Laws of the West Virginia State Bar. The new provision regarding jurisdiction was found in Rule 1, and stated:

> [T]he Supreme Court of Appeals does hereby establish a Lawyer Disciplinary Board [Board] to investigate complaints of violation of the Rules of Professional [C]onduct promulgated by the Supreme Court of Appeals to govern the professional conduct of those admitted to the practice of law in West Virginia and to take appropriate action in accordance with the provisions of the rules of Lawyer Disciplinary Procedure.

The Rules of Lawyer Disciplinary Procedure were then amended, effective January 1, 1995, in response to an inquiry from the Lawyer Disciplinary Board as to whether the Board had jurisdiction under the circumstances herein involved, and thus, the current provision states:

> [T]he Supreme Court of Appeals does hereby establish a Lawyer Disciplinary Board [Board] to investigate complaints of violation of the Rules of Professional Conduct promulgated by the Supreme Court of Appeals to govern the professional conduct of those admitted to the practice of law in West Virginia *or any individ-*

> *ual admitted to the practice of law in another jurisdiction who engages in the practice of law in West Virginia* and to take appropriate action in accordance with the provisions of the Rules of Lawyer Disciplinary Procedure.

**37.** *State ex rel. Eads v. Duncil,* 196 W.Va. 604, 474 S.E.2d 534 (1996).

**38.** Rule 3.7(a) states:

> (a) A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness except where:
> (1) the testimony relates to an uncontested issue;
> (2) the testimony relates to the nature and value of legal services rendered in the case; or
> (3) disqualification of the lawyer would work substantial hardship on the client.

**39.** In part, Rule 61 of the Rules of Civil Procedure reads as follows:

> [N]o error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judg-

Civil Procedure, which rules are applicable to disciplinary proceedings under Rule 3.6 of the Rules of Disciplinary Procedure. Because we find that none of the due process errors complained of worked substantial injustice or prejudiced substantial rights of the respondents, we conclude that any such errors were harmless.

### OTHER ASSIGNED ERRORS

 Respondents argue that the Hearing Panel erred in rejecting their motion to sever their case from the case of Phillip Allen, which prejudiced their case in two respects. First, because Mr. Allen did not respond to discovery requests and did not appear at the evidentiary hearing, his disregard for these proceedings prejudiced the Hearing Panel against respondents by virtue of their professional relationship with Mr. Allen. Second, Exhibit 9, a letter from Mr. Allen to Ms. Goodman, complainant's counsel, contained highly damaging admissions which would not have been admissible had Mr. Allen been severed from the case.

The Board responds that respondents were not entitled to severance under Rule 20 of the West Virginia Rules of Civil Procedure. Moreover, due to respondent Allen's absence, there were no inconsistent defenses. The Board also asserts that Exhibit 9 would have been admissible against respondents under Rule 801(d)(2) of the West Virginia Rules of Evidence, even if the case had been severed.

We do not believe that the Board erred in this regard. As stated above, the Rules of Professional Conduct impose special duties on partners in a law firm. Mr. Allen was a partner along with Mr. Coale and Ms. Van Susteren. Therefore, the Board did not err in denying Mr. Coale and Ms. Van Susteren's motion to sever.

Finally, respondents argue that the Hearing Panel erred in ruling that the disciplinary charges were not barred by laches and by admitting incompetent evidence on numerous occasions. We find these assignments to be without merit.

ment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of

### CONCLUSION

This Court retains the inherent power to regulate the practice of law in this State, and under Rule 1 of the Rules of Lawyer Disciplinary Procedure, as amended by this Court on December 6, 1994, a lawyer is subject to discipline in this State for violating the West Virginia Rules of Professional Conduct if he or she engages in the practice of law in this State, whether or not he or she is formally admitted to practice by this Court. Because this Court, at the time of respondents' conduct, had made subject to professional discipline only those persons who "regularly engaged in the practice of law" in West Virginia, we decline to impose any professional discipline on respondents for their conduct. Having declined to impose sanctions in this case, we dismiss the charges.

Charges dismissed.

the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.